## GUARDIANSHIP OF Samuel S. COLLIER.

Supreme Judicial Court of Maine.

Submitted on Briefs Sept. 6, 1994.

Decided Feb. 1, 1995.

Samuel S. Collier, pro se.

Gene R. Libby, Verrill & Dana, Kenne-bunk, for appellee.

Before WATHEN, C.J., and ROBERTS, GLASSMAN and CLIFFORD, JJ.

GLASSMAN, Justice.

Samuel S. Collier appeals from the judgment of the York County Probate Court (*Brooks, J.*) adjudicating Collier an incapacitated person and appointing Theresa Skaling Ketchum to be his full guardian. 18-A M.R.S.A. §§ 5-101 to 5-313 (1981 & Supp. 1994). We affirm the adjudication of incapacity but vacate the appointment of a full guardian.

The record reveals the following: Based on the complaint of a neighbor, on April 18, 1993, Collier was issued a summons for criminal threatening and was charged with criminal threatening with a dangerous weapon on April 27, 1993. On May 3, 1993, he was involuntarily committed to Jackson Brook Institute. On May 7, 1993, Collier's father signed a petition, pursuant to section 5-303, seeking the appointment of Theresa Skaling Ketchum as Collier's guardian. Pursuant to section 5-310, Ketchum was appointed Collier's temporary guardian on that date.

Thomas E. Geyer, Esq., who had represented Collier on previous occasions, was contacted by him and undertook his representation in the pending criminal charges, as well as in the present proceedings. On June 7, 1993, on behalf of Collier, Geyer filed an objection to the appointment of a full guardian for Collier and on August 13, 1993, filed a petition for the removal of the temporary guardian.

After extensions of his involuntary commitment,[1] Collier was discharged from Jackson Brook Institute to a halfway house in South Portland on August 31, 1993, where he was residing on November 9, 1993, the date of the hearing on the two petitions before the Probate Court. From the judgment of the Probate Court adjudicating Collier as an incapacitated person and appointing Ketchum as his full guardian, Collier appeals.[2]

---

1. The record reflects that between the time that Geyer undertook the representation of Collier until the hearing on November 9, 1993, dissension arose between Ketchum and her counsel and Geyer and Collier relating to the role of Ketchum and her counsel and that of Geyer in the representation of Collier, both in the pending criminal charges against him and the present proceedings, including the extension of Collier's involuntary commitments to Jackson Brook Institute.

2. Geyer's death occurred sometime in the interim between the date of the judgment and the appeal in this matter. In all proceedings subsequent to the judgment of the Probate Court, Collier has appeared *pro se*.

■ The appointment of a guardian requires in the first instance that the Probate Court make factual findings that the person for whom the guardianship is sought is incapacitated and "that the appointment is necessary or desirable as a means of providing continuing care and supervision of the person." Section 5–304(b). Section 5–101 defines an incapacitated person as

> any person who is impaired by reason of mental illness, mental deficiency, physical illness or disability, chronic use of drugs, chronic intoxication, or other cause except minority to the extent that he lacks sufficient understanding or capacity to make or communicate responsible decisions concerning his person.

18–A M.R.S.A. § 5–101(a) (1981).

■ We review those factual findings of the Probate Court for clear error, and they will not be set aside unless there is no competent evidence in the record to support the findings. Here, the court had before it evidence that prior to his involuntary commitment to Jackson Brook Institute, Collier had a history of several hospitalizations of varying periods of time since December 1985. In each instance the hospitalizations had been the culmination of conduct by Collier manifesting delusional mistrust and fear of others with a potential of harm to himself or to others. During each hospitalization the primary treatment had been a course of medication. A diagnosis of paranoid schizophrenia was made at the time of his hospitalization at Jackson Brook Institute and was affirmed by the testimony of Dr. Carlyle B. Voss, a psychiatrist retained by Ketchum to do an independent evaluation of Collier. The necessity of continuing a strict regimen of such medication to prevent a recurrence of conduct leading to his hospitalizations was emphasized. The court also heard evidence of Collier's inability to acknowledge the need for such a regimen. On this record we cannot say there was clear error in the Probate Court's findings that Collier suffers a present incapacity from mental illness that impairs his capacity to reliably make responsible decisions concerning his medical needs and that the appointment of a guardian is desirable to provide supervision of Collier in that regard.

■ Following the Probate Court's determination that a person is incapacitated and that the appointment of a guardian is necessary or desirable, it must determine the extent of the power to be exercised by the guardian with relationship to the incompetent person. We review that decision to determine whether the court has abused its discretion. The general powers of a full guardian are set forth in section 5–312, that provides in pertinent part:

> A guardian of an incapacitated person has the same powers, rights and duties respecting his ward that a parent has respecting his unemancipated minor child, except that a guardian is not legally obligated to provide from his own funds for the ward. . . . In particular, and without qualifying the foregoing, a guardian has the following powers and duties, *except as modified by order of the court:*
>
> (1) . . . . he is entitled to custody of the person of his ward and may establish the ward's place of abode within or without this State, and may place the ward in any hospital or other institution for care. . . .
>
> (2) . . . . Without regard to custodial rights of the ward's person, he shall take reasonable care of his ward's clothing, furniture, vehicles and other personal effects. . . .
>
> (3) A guardian may give or withhold consents or approvals related to medical or other professional care, counsel, treatment or service for the ward. The guardian is empowered to withhold or withdraw life-sustaining treatment when the ward is in a terminal condition or persistent vegetative state. . . .
>
> (4) . . . .
>
> (ii) Receive money and tangible property deliverable to the ward. . . .

18–A M.R.S.A. § 5–312 (1981 & Supp.1994) (emphasis added).

In recognition that the "appointment of a guardian for an incapacitated person affects the fundamental personal liberty of the prospective ward," *Matter of Howes,* 471 A.2d 689, 691 (Me.1984), by P.L.1985, ch. 440, § 2, the Legislature completely replaced and

modified section 5–304. Previously, the section had merely stated the court could appoint a guardian if a person was incapacitated and the appointment was necessary to provide continuing care and supervision. The present section provides:

> The court shall exercise the authority ... so as to encourage the development of maximum self reliance and independence of the incapacitated person and make appointive and other orders only to the extent necessitated by the incapacitated person's actual mental and adaptive limitations or other conditions warranting the procedure.

18–A M.R.S.A. § 5–304(a) (Supp.1994). *See* I P. Hunt, *Maine Probate Law,* Commentary to section 5–304 (1991) ("The 1985 amendment was intended to make clear to the court that guardianship proceedings should be exercised to provide maximum protection for the allegedly incapacitated person and with a view toward giving the allegedly incapacitated person the maximum of independence and self-reliance consistent with actual physical or mental limitations of the incapacitated person."). The mandate of section 5–304(a) is specifically authorized by section 5–105 that provides:

> In any case in which a guardian can be appointed by the court, the judge may appoint a limited guardian with fewer than all of the legal powers and duties of a guardian. The specific duties and powers of a limited guardian shall be enumerated in the decree or court order. A person for whom a limited guardian has been appointed retains all legal and civil rights except those which have been suspended by the decree or order.

18–A M.R.S.A. § 5–105 (1981). *See* Unif.Probate Code § 5–306 comment (1983) (principle underlying limited guardianship concept is to remind appointing court that guardianship should not confer more authority over person of ward than necessary to alleviate problem caused by incapacity).

In determining the propriety of the court's decision in the instant case, we examine all the facts and circumstances before the court. The record discloses the following: For approximately two and one-half years prior to May 3, 1993, Collier, a single person, approximately 34 years of age, had been living alone at a family-owned residence in Ogunquit. After his graduation from Harvard College in 1981, he spent three years in Japan where he worked at a government research institute, studied and taught English. In addition to English, Collier speaks six other languages. He returned to this country and was accepted in a master's program in business administration at the International Institute for Business Administration in France. His first hospitalization occurred in San Francisco. In the course of that hospitalization and subsequent ones there had been some difficulties with the course of treatment, apparently caused by the lack of a clear diagnosis. There had been some unfortunate side effects from some of the medication administered in the course of some of the hospitalizations.

The incident that gave rise to the present proceeding involved a dispute between Collier and a neighbor over seven turkeys kept by Collier. The court heard testimony of the Ogunquit code enforcement officer that as a result of his inspection of Collier's residence he had determined that because of unsanitary conditions and the possible risk of fire caused by an improperly installed wood stove, the house was not safe for human habitation. Photographs taken by the code enforcement officer depicting the interior of the house were introduced in evidence.

Dr. Voss testified that he had reviewed the medical records of Collier's hospitalizations, including the records of the halfway house where Collier had resided since his discharge from Jackson Brook Institute. He had also met with Collier for approximately 20 minutes. The records at Jackson Brook Institute reflected that on admission Collier was physically well nourished. During the course of his hospitalization at Jackson Brook Institute, as a result of a regimen of medication, there was a substantial improvement in Collier's ability to care for himself, interact and to manage his living. Dr. Voss stressed the importance of continued adherence to the medication regimen and opined that if Collier were off medication over a period of time he could again gradually lapse into a situation

**902**

that requires hospitalization. He stated that it is consistent with the diagnosis of paranoid schizophrenia that Collier, as with other like persons, either does not recognize or denies any mental illness and accordingly could fail to take the necessary medication. Providing Collier with some external structure, therefore, was desirable at that time. Dr. Voss testified that in his experience of treating approximately 200 persons with the same diagnosis few had guardians and that the individuals lived independently with supervision by various types of mental health providers to assure that the necessary regimen of medication was being followed by each individual.

 Because the appointment of a full guardian without limitation affects the fundamental personal liberty of the prospective ward, it should not be done without careful consideration of the prospective ward's specific needs. Nothing in the present record indicates that the Probate Court considered a less restrictive guardianship to meet Collier's specific needs. Contrary to and notwithstanding the comprehensive power of a full guardian over the life of a ward, the court stated its belief that throughout the guardianship Collier retained the power to regulate the degree of control the guardian could exert over his life. Reliance on Collier's future conduct by the Probate Court suggests that it did not exercise its discretion in the instant case in determining the extent of the power to be exercised by Ketchum as guardian with relationship to Collier.

■ Because Collier appears before us *pro se*, we direct the attention of the Probate Court to section 5–303(b), one of the procedures designed to protect the liberty interest of an allegedly incapacitated person, that provides in pertinent part:

> If it comes to the court's attention that the allegedly incapacitated person wishes to contest any aspect of the proceeding or to seek limitation of the proposed guardian's powers, the court shall appoint an attorney to represent the allegedly incapacitated person. The cost of this appointment of the ... attorney must be paid from the estate of the allegedly incapacitated person

if the court is satisfied sufficient funds are available.

18–A M.R.S.A. § 5–303(b) (Supp.1994).

The entry is:

Except as to the determination of incapacity, judgment vacated. Remanded for further proceedings consistent with the opinion herein.

All concurring.