1998 ME 186

### GUARDIANSHIP OF Maryanne HUGHES.

Supreme Judicial Court of Maine.

Argued June 11, 1998.

Decided July 24, 1998.

Helen M. Bailey (orally), Kristin L. Aiello, Augusta, for appellant.

Andrew Ketterer, Attorney General, Peter J. Brann, Asst. Atty. Gen., (orally), Christopher C. Leighton, Asst. Atty. Gen., Sally M. Wagley, Asst. Atty. Gen., Augusta, for appellee.

Before WATHEN, C.J., and ROBERTS, CLIFFORD, RUDMAN, DANA, and SAUFLEY, JJ.

DANA, Justice.

[¶ 1]  Maryanne F. Hughes appeals from the judgment entered in the Kennebec County Probate Court (*Mitchell, J.*) appointing the Department of Human Services as her limited public guardian pursuant to 18–A M.R.S.A. §§ 5–601 to 5–614 (1998). Hughes contends the court's use of the preponderance of the evidence standard to determine whether she is an incapacitated person denied her due process of law, the court erred by granting the guardian medical decision-making authority and by failing to make findings of fact, and the evidence presented by the Department was insufficient to establish that she is an incapacitated person. We affirm in part and vacate in part.

I.

[¶ 2]  Maryanne Hughes was involuntarily committed to the Augusta Mental Health Institute (AMHI) in September 1996 at the age of seventy-eight. Prior to the hospitalization, Hughes lived independently in the same apartment in Waterville for over forty-three years. She was discharged from AMHI in December 1996 with a plan to return to her apartment building, but to a different apartment unit because her former apartment had been condemned. Upon arriving at the building, Hughes entered her former apartment and refused to leave. Rescue workers escorted her from her apartment, transported her to an emergency room, and she was eventually readmitted to AMHI, where she presently resides.

[¶ 3]  In June 1997 the Department of Human Services, Bureau of Elder and Adult Services (DHS) filed a petition in the Probate Court that requested it be named full public guardian for Hughes and alleged that because of her mental illness, Hughes was "unable to make responsible decisions regarding all areas of decision making, including medical/psychiatric treatment, placement and finances." Hughes objected to the guardianship, and a contested hearing was held in early October 1997.

[¶ 4]  At the hearing, DHS called three witnesses: Ann LeBlanc, Ph.D., a licensed psychologist and assistant superintendent at AMHI; Jane Wolf, M.D., Hughes's treating psychiatrist at AMHI; and Alice Ladd, a DHS caseworker. Both LeBlanc and Wolf diagnosed Hughes as suffering from a delusional disorder that interfered with her ability to make certain decisions. LeBlanc testified that, in her opinion, Hughes's illness affected her overall decision-making capability. Wolf expressed her opinion that Hughes

does not have the capacity to make responsible decisions with respect to her psychiatric treatment or her living arrangements, but stated she could not render an opinion on whether Hughes had capacity with respect to medical or financial matters.

[¶ 5] Alice Ladd testified that she was called to Hughes's apartment in December 1996 when Hughes refused to leave her condemned apartment. She reported that the apartment was filled with a great deal of clutter, that there were newspapers and cardboard boxes piled high throughout the apartment, and that she could barely see where the toilet was because of all the things piled in the bathroom.

[¶ 6] Hughes moved for a judgment as a matter of law pursuant to M.R. Civ. P. 50(d) at the close of DHS's case, arguing that a clear and convincing standard of proof should be applicable to guardianship proceedings, and that even if a preponderance of the evidence standard was applied, DHS had not met their burden of presenting a prima facie case that she was incapacitated. The court ruled that the customary civil standard of proof should apply in guardianship proceedings, but exercised its discretion pursuant to Rule 50(d) to decline to enter a judgment until the close of all of the evidence.

[¶ 7] Hughes then presented testimony from two of her friends and from a mental health worker at AMHI, as well as testifying herself. After the parties filed post-trial memoranda, the court issued its order that found, by a preponderance of the evidence, that Hughes was incapacitated by a mental illness and that the incapacity affected Hughes's ability to secure and maintain decent and safe housing in the community. The court appointed DHS as Hughes's public guardian with the following limitations:

1. The guardian shall have no authority to consent to the administration of medications to the ward against the expressed will of the ward.

2. As long as the ward remains an inpatient at a recognized institution treating the mentally ill, her guardian shall have no authority over the ward's financial or residential decisions.

3. Upon the ward's discharge from an institution as described in the preceding paragraph, and prior to that for purposes of discharge planning only, the guardian shall have the full authority accorded by law to make all decisions for the ward other than decisions to allow administration of medications to the ward against the expressed will of the ward.

4. Should Maryanne F. Hughes leave and return to an institution, the guardian's powers shall cease for the time she is reinstitutionalized.

Hughes made motions to alter or amend the judgment pursuant to M.R. Civ. P. 59(e) and for findings of fact pursuant to Rules 50(d) and 52(a). In response, the court clarified that its findings were based on a preponderance of the evidence standard but denied the motions in all other respects. This appeal followed.

II.

[¶ 8] Hughes's primary argument on appeal is that the due process requirements of the Fourteenth Amendment of the United States Constitution and Article 1, Section 6–A of the Maine Constitution demand the application of a clear and convincing evidentiary standard in guardianship cases. "This Court has long adhered to the principle that the Maine Constitution and the Constitution of the United States are declarative of identical concepts of due process." *State v. Rosado,* 669 A.2d 180, 182 (Me.1996) (quotation omitted). Hughes and DHS agree that the test for determining the evidentiary standard necessary to provide a potential ward due process is that set out in *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), and *Mahaney v. State,* 610 A.2d 738 (Me.1992). The parties disagree, however, about the result of that test.

[¶ 9] In a procedural due process challenge, we must first determine whether the governmental action has resulted in a deprivation of life, liberty, or property. *Mahaney,* 610 A.2d at 742. The parties agree that the interests at stake in a guardianship proceeding are constitutionally protected interests. *See Matter of Howes,* 471 A.2d 689, 691 (Me.1984) ("The appointment of a

guardian for an incapacitated person affects the fundamental personal liberty of the prospective ward."). If a deprivation has occurred, we are next required to determine what process is due the individual under the Fourteenth Amendment. "Due process is a flexible concept that typically requires consideration of a number of factors, including the importance of the individual's interest, the potential for governmental error, and the magnitude of the state's interest." *Mahaney*, 610 A.2d at 742; *cf. Mathews*, 424 U.S. at 335, 96 S.Ct. 893 (recognizing the same three distinct factors for due process consideration). A careful consideration of the three factors convinces us that the constitutional requirement of due process is satisfied by the application of a preponderance of the evidence standard in guardianship proceedings.

[¶ 10] Regarding the first due process factor, the importance of the individual's interest, Hughes notes that a number of her fundamental rights are constrained by virtue of the guardianship, including her right to marry, her right to travel, and her right to vote. She draws an analogy between guardianship proceedings and proceedings for involuntary civil commitment, which require proof that an individual is mentally ill and dangerous to herself or others by a clear and convincing standard. *See Addington v. Texas*, 441 U.S. 418, 429–33, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979); 34–B M.R.S.A. § 3864(6)(A)(1) (Supp.1997). We agree with the Probate Court, however, that the potential infringement of Hughes's liberty at stake in this proceeding is not as extreme as the liberty interest at stake in *Addington.*

[¶ 11] *Addington* addressed the involuntary commitment of an individual to a mental health facility. The commitment procedure involved a *complete* deprivation of a person's liberty to the extent the person could lawfully be restrained by force from leaving the facility. An institutionalized person can not earn a living, can see visitors only at the discretion of hospital staff, and is prevented from engaging in virtually all everyday activities most of us take for granted. Such a deprivation of rights reasonably can be termed the most severe deprivation short of imprisonment. A person under guardianship, while facing significant constraints on her decision-making ability, is not subject to nearly the same deprivations of liberty. Although a guardian is entitled to establish the ward's place of abode, 18–A M.R.S.A. § 5–312(a)(1), nothing prevents the ward from simply walking away from the chosen residence. Similarly, a ward is free to spend her day as she sees fit, may visit with others or entertain visitors, may engage in a profession, and may be involved in any community activities she may wish to join. Without discounting the significant limitations a guardianship does impose on a ward, those limitations pale in comparison to persons facing involuntary commitment.

[¶ 12] Addressing the second due process factor, the risk of an erroneous deprivation of an individual's liberty interest through the procedures used, *see Mathews*, 424 U.S. at 335, 96 S.Ct. 893, Hughes contends that the guardianship findings are final and that once a guardian is appointed, she must face the burden of proving that she is no longer incapacitated. She asserts that, as in *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), which required a clear and convincing standard for the termination of parental rights, the State's resources in a guardianship proceeding dwarf those of the potential ward, thus magnifying the risk of an erroneous deprivation.

[¶ 13] Hughes's comparison to *Santosky* also fails to persuade us that a heightened evidentiary burden is necessary to adequately protect her liberty interests. One important aspect of the termination of parental rights procedure facing the Supreme Court in *Santosky* was the finality of the decision.

> Whether the loss threatened by a particular type of proceeding is sufficiently grave to warrant more than average certainty on the part of the factfinder turns on both the nature of the private interest threatened and the permanency of the threatened loss.... When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it.

*Santosky*, 455 U.S. at 758–59, 102 S.Ct. 1388. In Maine, a guardianship proceeding is more

closely analogous to a child protection proceeding than a termination proceeding. A court may order the removal of a child from a parent's custody if it finds by a preponderance of the evidence that the child is in circumstances of jeopardy to his health or welfare. 22 M.R.S.A. §§ 4035–4036 (1992 & Supp.1997). The parent's rights may not be terminated, however, without clear and convincing evidence that the termination is in the best interest of the child and that the parent is unfit to care for the child in some way. *Id.* § 4055. The primary difference in the two proceedings is the finality of the termination versus the potentially temporary nature of a removal. Contrary to Hughes's argument, a guardianship proceeding lacks the finality of a termination proceeding. A ward may petition for termination of the guardianship at any time by means of an informal letter to the court or judge, 18–A M.R.S.A. § 5–307(b), and although the burden to show regained capacity rests with the ward, *Guardianship of Lander*, 1997 ME 168, ¶ 7, 697 A.2d 1298, 1300, this burden is no different than that faced by a parent seeking to regain custody of a child after a finding that the child was in jeopardy. 22 M.R.S.A. § 4038(7)(B).

[¶ 14] Furthermore, the procedure for appointing a guardian mandated by the Probate Code contains a number of safeguards against serious risks of error, including the statute's requirement that a court impose a guardianship only to the extent of a person's incapacity, 18–A M.R.S.A. § 5–304(a), the mandatory appointment of a visitor, guardian ad litem, or attorney in all guardianship cases, *id.* § 5–303(b), the mandatory appointment of an attorney for any potential ward who wishes to contest the guardianship, *id.*, and the ability of a potential ward to introduce expert testimony that contradicts the petitioner's experts. *Id.* § 5–303(c).

[¶ 15] With regard to the third due process factor, the magnitude of the State's in-terest, Hughes acknowledges the State has a legitimate interest in protecting persons who may be unable to make responsible decisions for themselves, but contends that this interest does not equal an individual's interest in caring for herself should she have the capacity to do so. While we agree that Hughes has a significant interest in remaining free from governmental intrusion so long as she remains capable of caring for herself in a responsible manner, the State's interest in protecting its citizens from harm can not be discounted. A balanced evaluation of the constitutional considerations in this case persuades us that a preponderance of the evidence standard provides a respondent in a guardianship proceeding adequate due process. Any decision to raise the standard can and should come from the Legislature.[1]

### III.

■ [¶ 16] Hughes next argues that the court exceeded its discretionary power when it did not limit the guardian's authority in the area of medical decision making. One policy underlying the Probate Code's guardianship provisions is "to encourage the development of maximum self reliance and independence of the incapacitated person and make appointive and other orders only to the extent necessitated by the incapacitated person's actual mental and adaptive limitations or other conditions warranting the procedure." 18–A M.R.S.A. § 5–304(a). *See Guardianship of Collier*, 653 A.2d 898, 900–01 (Me.1995). The Probate Court's determination of the extent of the power to be exercised by the guardian in relation to the incompetent person is reviewed for an abuse of discretion. *Id.* at 900. "Because the appointment of a full guardian without limitation affects the fundamental personal liberty of the prospective ward, it should not be done without careful consideration of the prospective ward's specific needs." *Id.* at 902. In *Collier* we vacated

---

1. The Legislature has specifically indicated the burden of proof necessary in certain areas of guardianship proceedings. For instance, the Probate Code requires clear and convincing proof of the need for a guardian for a minor when a parent of the minor objects to the appointment, 18–A M.R.S.A. § 5–204(c), and the Code specifies that a termination of a minor's guardianship in the absence of the guardian's consent is only appropriate if the court finds by a preponderance of the evidence that termination is in the best interest of the ward. *Id.* § 5–212(d). These two examples, while not dispositive of the issue before us, illustrate that the Legislature is cognizant of its ability to mandate the standard that best reflects public policy.

the Probate Court's appointment of a full guardian because the record indicated that the Probate Court did not consider a less restrictive guardianship to meet the ward's specific needs and thus did not properly exercise its discretion.

[¶ 17] In the present case, it is clear that the Probate Court did consider, and in fact appointed, a limited guardianship. The court's order, which reflected its sensitive attention to the issues in this case, significantly restricted the guardian's authority to make decisions for Hughes while she remains hospitalized. Upon the discharge of Hughes from the hospital, however, DHS has virtually a full guardianship, with the only limitation being no authority to force Hughes to allow administration of medications. The broad authority granted by the court's order, which includes the power to give or withhold consents or approvals related to the medical care of the ward, *see* 18–A M.R.S.A. § 5–312(a)(3), is in contrast to the court's finding that "the evidence is that with respect to all medical treatment decisions other than those involving psychotropic drugs, the ward's decisions are rational." We are unable to discern from the court's order whether its finding with regard to Hughes's ability to make medical decisions relates to Hughes's global capability or, as the court found with respect to her financial and residential issues, whether the finding applies only to Hughes's medical decision-making ability while hospitalized. Because of the possible inconsistency between the court's finding and the limitations it placed on the guardianship, we conclude that we must remand the case to allow the court to clarify either its findings or its order of appointment.

### IV.

[¶ 18] Hughes next argues that the court's failure to make findings of fact upon her request constitutes reversible error. She contends M.R. Civ. P. 50(d), which provides that "[i]f the court renders judgment on the merits, the court *shall* upon request make findings as provided in Rule 52(a)," is mandatory and because the court did not address her request, its judgment must be vacated. In response to her motion, the court reiterated its determination that the preponderance of the evidence standard applies in guardianship proceedings, but made no further findings of fact.

[¶ 19] Section 5–304(c) of the Probate Code provides: "In its order, the court may make separate findings of fact and conclusions of law. If a party requests separate findings and conclusions, within 5 days of notice of the decision, the court shall make them." The purposes of making findings of fact are to inform the parties of the reasoning underlying the court's conclusions and to provide for effective appellate review. *See Sewall v. Snook,* 687 A.2d 234, 236 (Me.1996). These purposes are achieved when the court adequately sets out its findings in its order, and in that circumstance, no further findings should be required. The second sentence of section 5–304(c), which makes the issuance of findings mandatory on request of a party, logically only applies when the court chooses not to exercise its discretion to make findings pursuant to the first sentence of the section. This reasoning is supported by the language of M.R. Civ. P. 52(a), which mandates the making of findings upon request of a party in all actions tried without a jury but provides that "[i]f an opinion or memorandum of decision is filed, it will be sufficient if the findings of fact and conclusions of law appear therein." Because the court's order did include findings, we reject Hughes's contention that the denial of her motion for findings warrants reversal.

### V.

[¶ 20] Hughes also argues that the evidence presented by DHS in its case-in-chief was insufficient to survive a motion for a judgment as a matter of law, even under a preponderance of the evidence standard. We review the trial court's denial of a motion for a judgment as a matter of law by examining the evidence in the light most favorable to the plaintiff to determine whether any reasonable view of the evidence, including all justifiable inferences to be drawn therefrom, can sustain the verdict. *Grover v. Minette–Mills, Inc.,* 638 A.2d 712, 716 (Me.1994). "The burden is on the moving party to show .

that the adverse verdict is clearly and manifestly wrong." *Id.* (quotations omitted).

■ [¶ 21] In order to present a prima facie case for the appointment of a guardian, DHS was required to prove that Hughes was incapacitated and that the appointment was necessary or desirable as a means of providing continuing care and supervision of Hughes. 18–A M.R.S.A. § 5–304(b). An incapacitated person is one "who is impaired by reason of mental illness ... to the extent that [s]he lacks sufficient understanding or capacity to make or communicate responsible decisions concerning h[er] person." *Id.* § 5–101(1). Although Hughes refers us to portions of the experts' testimony that militate against the appointment of a guardian, both doctors testified that Hughes has a mental illness that prevents her from making responsible decisions in at least some areas of her life. "The weight of the evidence and credibility of witnesses is within the exclusive province of the factfinder." *Bowden v. Grindle*, 675 A.2d 968, 972 (Me.1996). The evidence presented, when viewed in the light most favorable to DHS, was sufficient to withstand a motion for judgment as a matter of law.

The entry is:

Except as to the determination of incapacity, judgment vacated. Remanded for further proceedings consistent with this opinion.

