2005 ME 8

**GUARDIANSHIP OF K–M.**

Supreme Judicial Court of Maine.

Argued: Sept. 22, 2004.
Decided: Jan. 18, 2005.

Charlene A. Hoffman (orally), Charlene A. Hoffman, P.A., South Portland, for appellant.

Daniel W. Boutin (orally), Jewell & Boutin, P.A., Portland, for appellee.

G. Steven Rowe, Attorney General, Carmen L. Coulombe, Asst. Atty. Gen. (orally), Augusta, for intervenor.

Panel: SAUFLEY, C.J., and CLIFFORD, RUDMAN, DANA, ALEXANDER, CALKINS, and LEVY, JJ.

CALKINS, J.

[¶ 1] Derryl Denise K–M appeals from the adjudication of incapacity and the appointment of a guardian and conservator for her by the Cumberland County Probate Court (*Childs, J.*). She argues that (1) 18–A M.R.S.A. § 5–303(b)(1998) violates the Due Process Clauses of the United States and Maine Constitutions; (2) the court's order pursuant to section 5–303(b), requiring her to submit to a psychological evaluation without an evidentiary hearing, violated her due process rights; and (3) the Probate Court erred in adjudicating her an incapacitated person. We disagree with her contentions, and we affirm the judgment.

## I.  PROCEDURE AND FACTS

[¶ 2] K–M lives at her condominium in Portsmouth, New Hampshire, in the winter and in the summer she stays at a family camp in Bridgton.[1] K–M is es-

---

1. K–M testified that prior to 1998 she lived year-round at the winterized camp in Bridg-

ton, but that an ice storm significantly damaged the camp so that it is not habitable in

tranged from her sister, Diane, who is a part owner of the family camp and a joint owner with K–M of various equities. In January 2002, Diane petitioned a New Hampshire court to commit K–M. The court denied the petition finding that there was no evidence that K–M was mentally ill and at risk from her own actions.

## A. Petition for Guardianship

[¶ 3] A few months after a New Hampshire court declined to commit K–M, Diane filed a petition with the Probate Court for her appointment as K–M's guardian and conservator. The petition alleged that K–M suffers from a mental illness, is at risk of physical harm because of her behavior, and is unable to manage her property and affairs. The petition reported that she assaulted and harassed neighbors and was unable to arrange for home repairs, thereby living without indoor plumbing. Additionally, the petition stated that K–M claims to hear voices and believes that others are spying on her and videotaping her. The petition also contained allegations concerning finances, such as K–M's failure to pay taxes and condominium fees. The petition further stated that K–M was the joint owner of shares of valuable stock

but that she had failed or refused to return or redeem the stock of companies that had merged.

[¶ 4] The Probate Court appointed a visitor who served K–M with notice of the petition.[2] The visitor reported to the Probate Court that K–M asked for copies of the statutes that were cited in the petition. When the visitor suggested she was not entitled to such copies, she said she would insist upon it. She declined to be interviewed by the visitor. The visitor further reported that K–M was "suspicious because of 'all the legal documents' she has had to deal with lately, but she would not elaborate." The visitor concluded that there was a "paranoid, passive aggressive flavor to her reaction" to his visit and the court proceeding.

## B. Motion for Psychological Evaluation

[¶ 5] Diane also filed an ex parte motion for a psychological evaluation of K–M supported by her own affidavit. The motion stated that it was brought pursuant to M.R. Prob. P. 35.[3] Diane's affidavit stated that K–M on many occasions has said that she hears voices, is being secretly video-

---

the winter because running water and insulation have not been restored.

**2.** Pursuant to 18–A M.R.S.A. § 5–303(b)(1998), the Probate Court is required to appoint a visitor, a guardian ad litem, or a lawyer as soon as a petition for guardianship is filed, unless the respondent is already represented by an attorney. The visitor or guardian ad litem is required to interview the respondent and the petitioner and visit the residence of the respondent. *Id.* § 5–303(c)(1998). The visitor or guardian ad litem must explain the petition to the respondent and ascertain if the respondent wants to contest any aspect of the petition. *Id.* In addition, the visitor or guardian ad litem must file a report with the Probate Court. *Id.*

**3.** M.R. Prob. P. 35, which is entitled "Physical and Mental Examination of Persons," reads:

"Rule 35 of the Maine Rules of Civil Procedure governs procedure in all formal probate and civil proceedings in the Probate Courts."

M.R. Civ. P. 35(a), in pertinent part, states:
(a) Order for Examination. When the mental or physical condition ... of a party ... is in controversy, the court in which the action is pending may order the party to submit to a physical or mental examination by a licensed physician or a mental examination by a licensed psychologist.... The order may be made only on motion for good cause shown and upon notice to the person to be examined and to all parties and shall specify the time, place, manner, conditions, and scope of the examination and the person or persons by whom it is to be made.

taped and that others listen to her through her radio. Diane also averred that K–M has said that she can control the minds of others. Diane listed phone calls she received from K–M's neighbors and the incidents they had described to her concerning K–M's behavior. The affidavit further detailed K–M's living conditions, her lack of medical treatment, her failure to pay taxes and condominium fees, and other financial circumstances.

[¶ 6] The court granted Diane's motion for an ex parte psychological evaluation. The court found that there was good cause for the examination, a finding presumably based upon the affidavit, petition, motion, and visitor's report.

[¶ 7] Two weeks later, and before the psychological examination took place, the court appointed an attorney to represent K–M.[4] K–M, through her attorney, then filed an objection to the order for a psychological evaluation and requested that the court vacate the order.

[¶ 8] The court held a conference attended by counsel and the parties. No evidence was presented. At the conference Diane contended that the court was required to order a psychological evaluation pursuant to 18–A M.R.S.A. § 5–303(b).[5] K–M argued that an evidentiary hearing was required so that the court could determine if there was good cause for the examination and that a finding of good cause was required by M.R. Prob. P. 35. She contended that she had a protected constitutional interest in refusing an evaluation and could not be deprived of that interest without due process. After receiving memoranda of law from the parties on the issue of whether an evidentiary hearing was required, the court concluded that section 5–303(b) applied and ordered K–M to submit to an evaluation by a named psychologist, without granting her request for an evidentiary hearing.

[¶ 9] The psychologist met with K–M twice and interviewed her for a total of six hours. K–M's attorney was present throughout the interviews. The psychologist did not perform any tests. He filed a report with the Probate Court stating that K–M's thinking was "rife with significant persecutory delusions." He further reported that she believes that people have been routinely entering her residences, stealing property, defacing and vandalizing items, and at other times simply moving things to annoy her. According to the psychologist, K–M believes that she has been under surveillance through video cameras around her Bridgton home and that the electronics of her car radio could broadcast her thoughts to those who were harassing her. The psychologist characterized her as "suspicious, evasive, obfuscatory and circumstantial." K–M was unwilling to discuss any medical or psychological treatment she might have undergone, and she provided only rudimentary facts to the psychologist about her income, stocks, and assets. The psychologist's diagnosis was that "she is experiencing at least a persecutory delusional disorder and possibly one of a paranoid schizophrenia." Without a history from her, he was unable to opine further on the diagnosis. It was his opinion that K–M's ability to care for herself was limited and

4. The Probate Code requires that counsel be appointed for a respondent who wishes to contest any aspect of a guardianship petition. 18–A M.R.S.A. § 5–303(b).

5. The relevant sentence of 18–A M.R.S.A. § 5–303(b) reads: "The person alleged to be incapacitated must be examined by a physician or by a licensed psychologist acceptable to the court who shall submit a report in writing to the court, providing diagnoses, a description of the person's actual mental and functional limitations and prognoses."

that she was incapable of establishing her place of abode, making provisions for her care, comfort and maintenance, arranging for medical care for herself, or managing and protecting her assets.

## C.   Hearing on the Petition

[¶ 10] At the hearing on the guardianship petition, the evaluating psychologist, the Bridgton police chief, Bridgton neighbors, a cousin, Diane, and K–M all testified. Letters, other documents, and photographs were admitted into evidence. Diane filed a plan setting forth the proposed living arrangements for K–M and other particulars required by 18–A M.R.S.A. § 5–303(a)(1998).

[¶ 11] The police chief testified that K–M had made numerous, unfounded complaints to the Bridgton police of people breaking into her home. Neighbors of her Bridgton camp testified about an incident where K–M had thrown rocks at a neighbor and an incident where K–M had slapped another neighbor. There was evidence that K–M had engaged in diatribes and outbursts at camp association meetings in 2000 and 2001. One of the neighbor witnesses had helped K–M arrange for car repairs in 2001, and he testified that K–M told him that the car radio was how others spied on her. There was evidence about the unfinished condition of the Bridgton camp and its lack of running water. The cousin and others testified that K–M had lost weight. The cousin testified that K–M told her that someone had installed a video camera to spy on her in her condominium in Portsmouth. The cousin also noted that several of K–M's appliances were broken and K–M would not hire anyone to repair them. The cousin said she had received several letters from K–M that did not make sense.

[¶ 12] The psychologist reiterated the substance of his report. He more fully described the manner in which K–M answered questions that he posed to her about how she would deal with certain situations. The psychologist recounted his conversations with K–M about her neighbors and his conclusion that her description of the neighbors and what they had done was delusional. He reiterated the diagnosis of delusional disorder of a persecutory nature and that "she probably has paranoid schizophrenia and has had a serious mental illness impairing her behavior ... for 20 plus years." When asked whether she could manage her own affairs, the psychologist testified, "[T]here are too many disorganized beliefs and associated intrusions of those beliefs that constantly get in the way of her being able to effectively manage those elements."

[¶ 13] Diane, who lives in New York, testified that her primary concern is K–M's physical and mental health. She also testified about the deteriorating condition of the Bridgton camp and the value of K–M's stocks, which decreased partly because of market forces but also because K–M refused to cooperate with investment counselors and others. She testified about K–M's refusal to complete a form in order to receive life insurance proceeds due her upon her father's death. Another example she gave of K–M's financial behavior concerned shares of U.S. West, which had merged with Qwest. Qwest sent letters to K–M explaining why she had to exchange the U.S. West shares for Qwest shares and directions on making the exchange. According to Diane, K–M refused to sign any documents to allow the exchange of the shares. Other financial issues included property taxes and condominium fees. Diane, in cooperation with K–M's daughter, a full-time student, arranged to pay the condominium fees on the Portsmouth residence because K–M had not paid them.

[¶ 14] K–M testified and denied that she was suffering from any mental illness. She had completed course work for a Ph.D. in psychology in 1982 and worked as a master's level psychotherapist for a time. She admitted that she had made numerous calls to both the Bridgton and Portsmouth police because of unknown people entering her residences and taking or damaging her property. She denied that she ever told anyone that video cameras were spying on her. She denied assaulting her neighbor. She said that she was willing to have repairs made to the camp and the Portsmouth condominium but was unable to find anyone to make them. She had been attempting to sell the Portsmouth condominium for some time. She testified that living at the Bridgton camp without running water was similar to the way it had been when she was a child and that she got along fine without running water. She admitted that she had refused to send stock certificates to her sister or to any untrustworthy location.

[¶ 15] The court found that (1) K–M was incapacitated; (2) Diane was qualified to be appointed her guardian and conservator; (3) the appointment was "necessary or desirable as a means of providing continuing care and supervision"; and (4) the appointment was necessary because of K–M's "actual mental and adaptive limitations or other conditions." The court limited the power of Diane by providing that she could not sell the Portsmouth or Bridgton real estate until she filed an inventory with the court accounting for the equities that were listed in an exhibit, after which the court would determine whether a bond was required.

[¶ 16] K–M appealed and challenges, on its face and as applied to her, the constitutionality of 18–A M.R.S.A. § 5–303(b)'s requirement of a psychological examination. She also appeals on the ground that the evidence was insufficient for the finding of her incapacity. Because the constitutionality of a state statute is at issue, the Attorney General participated in the appeal.[6]

## II. DISCUSSION

### A. Constitutionality of 18–A M.R.S.A. § 5–303(b)

[¶ 17] We review the constitutionality of a statute de novo, and we start our analysis from the premise that statutes are presumed constitutional. *Rideout v. Riendeau*, 2000 ME 198, ¶ 14, 761 A.2d 291, 297. If we can reasonably interpret a statute to be constitutional, we must do so. *Id.*

[¶ 18] The challenged statutory provision, 18–A M.R.S.A. § 5–303(b), is contained in Part 3 of Article V of the Maine Probate Code, 18–A M.R.S.A. §§ 5–301 to 5–313 (1998 & Supp.2004). Section 5–303 is entitled "Procedure for court appointment of a guardian of an incapacitated person." Subsection (a) requires the person nominated as guardian to file a plan arranging for the needs of the ward. Subsection (b) requires the court to do various things such as set a date for the hearing, appoint a visitor or guardian ad litem, and appoint an attorney if the proceeding is to be contested. Subsection (c) sets forth the obligations of the visitor or guardian ad litem as well as requirements for the hear-

---

**6.** The Attorney General did not participate in the Probate Court. M.R. Civ. P. 24(d), incorporated into the Probate Rules by M.R. Prob. P. 24, requires the party challenging the constitutionality of a state statute to notify the Attorney General so that the State of Maine can intervene. *See also* 14 M.R.S.A. § 5963 (2003). Because the parties failed to notify the Attorney General about the constitutional challenge, we invited the participation of the Attorney General on appeal.

ing. The two remaining subsections of section 5–303 set forth additional requirements.

[¶ 19] The challenged portion of the statute is in subsection (b), and it reads: "The person alleged to be incapacitated must be examined by a physician or by a licensed psychologist acceptable to the court who shall submit a report in writing to the court, providing diagnoses, a description of the person's actual mental and functional limitations and prognoses." Thus, unless a respondent voluntarily undergoes an examination, the statute can be fairly interpreted as requiring the court to order an examination.

[¶ 20] There are no requirements in the statutory scheme regarding the content of the guardianship petition. There is no requirement that the petition be under oath or that an affidavit accompany the petition. There is no procedure set forth in the Probate Code for a guardianship petitioner to request a psychological examination.

[¶ 21] K–M contends that the statute violates the Due Process Clause because it requires any person who is the subject of a guardianship petition to undergo a mental examination by a physician or psychologist without a prior hearing to determine whether there is good cause. She contends that her due process rights were violated when she was ordered, without the benefit of an evidentiary hearing, to be subjected to a psychological evaluation.

### 1. Liberty Interest

[¶ 22] Due process is implicated when governmental decisions infringe on liberty or property rights. K–M argues that she has a liberty interest in being free from psychological evaluations. The Supreme Court has held that there is a Fourteenth Amendment liberty interest "in refusing unwanted medical treatment,"

*Cruzan v. Dir., Mo. Dep't of Health,* 497 U.S. 261, 278, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990), and we have recognized that the right to decline medical care derives from the common law of informed consent to medical treatment, *In re Gardner,* 534 A.2d 947, 951 (Me.1987). We have noted "that the interests at stake in a guardianship proceeding are constitutionally protected interests." *Guardianship of Hughes,* 1998 ME 186, ¶¶ 9–10, 715 A.2d 919, 921–22. *See also Matter of Howes,* 471 A.2d .689, 691 (Me.1984) (holding that a guardianship affects fundamental rights of the ward). We agree with K–M that respondents in guardianship proceedings have a liberty interest in refusing to undergo a psychological examination.

### 2. Analysis Applicable to a Procedural Due Process Challenge

[¶ 23] Because section 5–303(b) operates to deprive a respondent, such as K–M,. of the liberty interest in refusing to undergo a psychological evaluation, we must decide what process is due before a court can order the psychological examination. In determining what procedures are adequate, we utilize the standard set forth in *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). We look at the private interest that will be affected by the governmental action; we consider the risk of an erroneous deprivation of that interest through the procedures that were used and whether there is value to adding or substituting other procedural safeguards; and we examine the governmental interest and what burden, if any, additional or substitute procedures would involve. *In re Amberley D.,* 2001 ME 87, ¶ 11, 775 A.2d 1158, 1163; *Guardianship of Hughes,* 1998 ME 186, ¶ 9, 715 A.2d at 921–22.

[¶ 24] As stated above, the asserted private interest is the right to refuse to un-

dergo a mental examination in a guardianship proceeding. The psychological evaluation that occurred in this case consisted of two interviews, lasting a total of six hours. No invasive medical procedures were performed. The psychologist asked questions and attempted to engage K–M in conversation.[7] She answered some questions and refused to answer others.

[¶ 25] Although there was a deprivation of K–M's right to refuse the psychological evaluation, it was not as serious a deprivation as an emergency commitment to a mental hospital. *See Guardianship of Hughes*, 1998 ME 186, ¶¶ 10–11, 715 A.2d at 922 (comparing the deprivation of liberty caused by a guardianship with the deprivation of liberty caused by civil commitment to a mental health facility). Nor is the seriousness of the deprivation of the interest as great as being arrested, subjected to arrest procedures, and locked in a jail cell for a number of hours or days. On the other hand, it is more serious than a few minutes detention by a police officer on a street.

### 3. Procedural Protection of a Good Cause Determination

[¶ 26] The procedure that was used initially in this case was an ex parte motion and the review by the court of the facts concerning K–M's incapacity that were contained in the petition and sworn to by Diane in her affidavit. The court also had the visitor's report. On the basis of those documents the court made a determination of good cause. After an attorney was appointed for K–M, the court held a conference with the attorneys and parties. The attorneys submitted legal memoranda. Although the court later appeared to conclude that the statute did not require it to make a determination of good cause, the fact remains that it originally made that determination. Furthermore, we are satisfied from our review of the documents available to the court that there was good cause to believe that K–M may be incapacitated by reason of mental illness and that a psychological evaluation would assist the court in determining whether she was incapacitated.

[¶ 27] Section 5–303(b) does not expressly require a finding of good cause to

---

7. An example of the type of conversation attempted by the psychologist that was described in detail in his testimony at the hearing concerned his question to K–M about what she would do if she needed money. In response, she said she would go to her bank, a half a mile away in Portsmouth. When the psychologist asked what she would do if she needed money at 3:00 in the morning, she said she did not need money at 3:00 in the morning. When asked what she would do if she needed money in Bridgton, she said she would go to the bank there. The psychologist asked if she had an account in Bridgton, and she said her bank was in Portsmouth. Then the psychologist asked if her bank had a branch in Bridgton, and she replied that she did not see how that applied. The psychologist testified, "So we would go around in logical conversation circles where sometimes it would be very difficult to discern what she was actually ... responding to or what they meant." He also testified about her answers to other life necessity questions, such as transportation and medical care. He asked her what she would do in the event of a fire, and he testified that:

> What I was looking for was use of the 911 emergency system. And the first time I asked her this question, if there was smoke from the house next door, she said, I would check it out and then I would call 911. Nice answer. And the second time I asked her the question on the second visit, I got a totally different set of answers that I could not—was not able to elicit conversation that involved contacting emergency people or the use of the 911 system or whether, in fact, it was any of my business whether she had a telephone. Because I wasn't being specific enough with her was I talking about New Hampshire or Bridgton.

believe that the alleged incapacitated person may be incapacitated and that a mental examination would assist the court in determining whether the person is incapacitated. However, we construe section 5–303(b) to contain such a requirement. This is a requirement that reasonably can be read into the statute, and in balancing the *Mathews v. Eldridge* factors, we conclude that a good cause finding is a prerequisite to ordering a medical or psychological examination. This is particularly true since there are no requirements as to the content of the guardianship petition.

[¶ 28] Interpreting section 5–303(b) to require a finding of good cause before an examination is ordered makes the section coextensive with M.R. Civ. P. 35, which allows a court to order the mental or physical examination of a party when requested by another party upon a finding of good cause and a finding that the mental or physical condition of the party is at issue. The federal counterpart to M.R. Civ. P. 35 has been upheld against a constitutional challenge. In *Schlagenhauf v. Holder*, 379 U.S. 104, 107–09, 85 S.Ct. 234, 13 L.Ed.2d 152 (1964), the defendant in a negligence action was ordered to undergo several medical examinations. He challenged the order as an unconstitutional invasion of his privacy. *Id.* at 112, 85 S.Ct. 234. The United States Supreme Court held that FED. R. CIV. P. 35 was constitutional as it was a procedural rule and was not a modification of substantive rights. *Id.* at 113–14, 85 S.Ct. 234. The Court also interpreted the good cause provision of the rule as not a mere formality, but a limitation that requires "discriminating application by the trial judge." *Id.* at 118, 85 S.Ct. 234.

■ [¶ 29] Interpreting section 5–303(b) to be coextensive with M.R. Civ. P. 35, and to require good cause, means that it is less likely that an erroneous deprivation will occur than if the statute is construed to mandate an examination without a finding of good cause. Furthermore, there is little governmental cost that will result from a good cause requirement. It is a requirement to which courts are accustomed. Because the burden is on the petitioner to establish the basis for the good cause finding, the petitioner is required to produce facts, but the necessary facts are basically a summary of the facts that a good faith petitioner would already have. Thus, the court is not required to utilize extensive procedures to make the good cause determination.

[¶ 30] In balancing the interest at stake and the risk of erroneous deprivation against the governmental cost, we conclude that a finding of good cause is a necessary procedural protection, and we interpret section 5–303(b) to require a finding of good cause. Because a finding of good cause was initially made in her case and because the record supports that finding, K–M was afforded the procedural protection of good cause.

4. Procedural Protection of an Evidentiary Hearing

■ [¶ 31] K–M would also have us add the procedural safeguard of an evidentiary hearing. In her view such is necessary for a finding of good cause. She does not state what evidence she would have provided at such a hearing. Presumably she considers the ability to cross-examine her sister as diminishing the risk that the court will erroneously determine that there was good cause to believe that K–M may be incapacitated. Also, in an evidentiary hearing she would be able to testify and present witnesses.

[¶ 32] On the other hand, there is a governmental interest in making guardianship proceedings as efficient as practicable and an interest in not requiring parties and witnesses to attend court unless neces-

sary. An evidentiary hearing would add time and monetary cost to the guardianship process.

[¶ 33] In determining whether an evidentiary hearing should be required and whether it will produce a benefit that outweighs its costs, it is useful to look at similar situations. In *Schlagenhauf*, 379 U.S. at 119, 85 S.Ct. 234, in examining FED. R. CIV. P. 35, the Court noted that in some cases an evidentiary hearing may be required, but in other cases good cause could be shown by affidavit or on the pleadings alone. The Illinois Supreme Court, in a case strikingly similar to this one, affirmed the trial court's order for a mental examination of the alleged incompetent person on the basis of affidavits that showed good cause. *Carpenter v. Stevenson*, 44 Ill.2d 525, 256 N.E.2d 766, 769 (1970).

[¶ 34] An evidentiary hearing is not required in other situations in which liberty interests are affected, particularly when the deprivation of liberty is temporary. People can be arrested on a warrant issued upon an affidavit setting forth probable cause, M.R.Crim. P. 4(a)(2); a judicial officer can set bail for a criminal defendant after an interview with the defendant, 15 M.R.S.A. § 1026(4) (2003); a person can be involuntarily committed to a mental institution for up to five days, upon the certificate of a physician and endorsement of a judge, 34–B M.R.S.A. § 3863 (1988 & Pamph. 2004); criminal defendants are ordered to undergo examinations for mental conditions "for cause shown," 15 M.R.S.A. § 101–B(1) (2003); and putative parents and their children can be required to undergo blood testing, 19–A M.R.S.A. § 1558 (1998). An evidentiary hearing is not required in any of the above rules or statutes.

[¶ 35] We conclude that requiring an evidentiary hearing would create additional cost without a corresponding benefit. In most cases a finding of good cause may be properly made without the need for an evidentiary hearing. There may be some situations in which a court would find an evidentiary hearing beneficial, and in those cases courts are free to hold hearings. However, we anticipate that in the vast majority of cases, the pleadings and accompanying affidavits will be adequate to allow a court to determine whether good cause exists.

[¶ 36] M.R. Civ. P. 35(a) requires notice to the person whose physical or mental examination is requested, but the rule does not require an evidentiary hearing. Because we are interpreting the examination portion of section 5–303(b) to be coextensive with Rule 35(a), notice of the examination must be served on the respondent. If the respondent objects to the examination, as K–M did here, the court will have to determine from the information before it, including the reason given for the opposition, whether it can make the good cause determination on the basis of documents or whether a hearing is necessary. We determine in this case, based on the information that the Probate Court had, which included the conference attended by K–M, an evidentiary hearing was not required.

5. Summary

[¶ 37] In applying *Mathews v. Eldridge* to determine what process is due, we perform a balancing test. We weigh the asserted right and the risk of being erroneously deprived of that right against the cost of the process that is requested. In performing that balancing for the mental examination required in section 5–303(b), we conclude that an alleged incapacitated person may not be ordered to undergo a medical or psychological examination without a good cause determination, that is, good cause to believe that the alleged inca-

pacitated person may be incapacitated, as that term is defined at 18–A M.R.S.A. § 5–101(1) (1998), and good cause to believe that an examination would assist the court in determining whether the person is incapacitated. Furthermore, an evidentiary hearing is not necessary to make that determination if the documentary information is adequate for the court's finding of good cause.

### B. Sufficiency of the Evidence

[¶ 38] K–M also contends that the Probate Court abused its discretion in determining that she is incapacitated. We understand this to be an argument that the evidence before the Probate Court was not sufficient for its finding. We review the court's findings for clear error. *In re Amberley D.*, 2001 ME 87, ¶ 20, 775 A.2d at 1165.

[¶ 39] K–M argues that the evidence primarily demonstrates a disagreement between her sister and herself, rather than a mental incapacity, and that her animosity toward Diane and others was not evidence of mental illness. She also argues that even if there was believable evidence of mental illness, such evidence did not mean that she lacked the capacity to make responsible decisions concerning herself.

[¶ 40] Although it may have been possible for a fact-finder to interpret the evidence as K–M would have wished, the evidence was sufficient to support the finding that she was incapacitated. There was evidence of her mental illness. Furthermore, there was evidence that she was not making appropriate decisions for her well-being and that she lacked the capacity to do so.

The entry is:

Judgment affirmed.