Jane DOE, Jill Doe and June Doe, by and through their guardian, Maine Department of Human Services, and the Disability Rights Center of Maine, Inc., Plaintiffs

v.

G. Steven ROWE, Attorney General for the State of Maine, et al., Defendants

No. 00–CV–206–B–S.

United States District Court, D. Maine.

Aug. 9, 2001.

Kristin L. Aiello, Disability Rights Center, Augusta, ME, for Jane Doe, Jill Doe, June Doe, plaintiffs.

William R. Stokes, Paul Stern, Susan P. Herman, Assistant Attorney General, Augusta, ME, for Attorney General, Secretary of State, defendants.

## ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT

SINGAL, District Judge.

Before the Court are both State Defendants' Motion for Summary Judgment (Docket # 41) and Plaintiffs' Motion for Summary Judgment (Docket # 44). Through these cross motions, the parties ask the Court to resolve the following significant question: By prohibiting voting by persons under guardianship for mental illness, does the Maine Constitution violate the Fourteenth Amendment and the Americans with Disabilities Act?

For the reasons described below, the Court answers this question in the affirmative. Thus, the Court GRANTS Plaintiffs' Motion and DENIES State Defendants' Motion.

## I. STANDARD FOR SUMMARY JUDGMENT

Generally, a federal court grants summary judgment "if ... there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "An issue is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Ayer v. United States*, 902 F.2d 1038, 1044 (1st Cir.1990) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). When faced

with cross motions for summary judgment, the Court must draw all reasonable inferences against granting summary judgment to determine if there are genuine issues of fact that require a trial. *See Cont'l Grain Co. v. Puerto Rico Mar. Shipping Auth.,* 972 F.2d 426, 429 (1st Cir.1992). However, " 'conclusory allegations, improbable inferences, and unsupported speculation' " will not suffice to create a genuine issue of material fact requiring a trial. *Dynamic Image Techs., Inc. v. United States,* 221 F.3d 34, 39 (1st Cir.2000) (quoting *Medina–Munoz v. R.J. Reynolds Tobacco Co.,* 896 F.2d 5, 8 (1st Cir.1990)). Pursuant to the Local Rules, the Court has "no independent duty to search and consider any part of the record." Local Rule 56(e). Rather, the Court relies on the parties' submitted statements of material facts ("SMF") and the record citations found therein to construe the relevant facts. *See* Local Rule 56.

## II. BACKGROUND

The Court has previously addressed the facts underlying this case in its Findings of Fact and Conclusions of Law on Plaintiffs' Motion for Preliminary Injunction (Docket # 16). While the Court lays out all of the relevant facts below in accordance with the summary judgment standards,[1] it refers interested parties to this earlier Order to put the facts, as well as the parties' proffered legal arguments, in context.

### Maine's Constitutional Restrictions on Voting [2]

Pursuant to Maine's Constitution and relevant implementing statute, persons who are "under guardianship for reasons of mental illness" are prohibited from registering to vote or voting in any election.[3] ME. CONST. art. 2 § 1; *see also* 21–A M.R.S.A. § 115(1). A mentally ill person under guardianship, who votes knowing that he or she is subject to the prohibition, can be subject to criminal prosecution. *See* 21–A M.R.S.A. § 674(3)(B) (making it a Class C crime for a person to vote or attempt to vote "knowing that the person is not eligible to do so.").

This restriction on voting by persons under guardianship due to mental illness was added to the Maine Constitution in 1965. Prior to the approval of the 1965

---

1. Although the parties have raised factual disputes in their respective Statements of Material Facts and responses thereto, the Court finds that these disputes are either not genuine or do not relate to material facts. Thus, none of these disputes prevent the Court from deciding the case at the summary judgment stage.

2. Forty-three other states have similar constitutional or statutory provisions disenfranchising persons because they fit within terms such as "under guardianship or conservatorship," "idiot," "insane," "lunatic," "mentally incompetent," "mentally incapacitated," "of unsound mind," and/or "not quiet and peaceable." *See* Kay Schriner et al., Democratic Dilemmas: Notes on the ADA and Voting Rights of People with Cognitive and Emotional Impairments, 21 Berkeley J. of Emp. & Lab. L. 437, 439, 456 tbl. 2 (2000). Federal law specifically allows for state laws to disenfranchise persons "by reason of criminal conviction or mental incapacity." 42 U.S.C. § 1973gg–6(a)(3)(B).

3. Maine has attempted to excise this disenfranchising provision from the Maine Constitution on two occasions through ballot referendums. In the November 1997 election, Maine voters were asked, "Do you favor amending the Constitution of Maine to remove language providing that all persons under guardianship for reasons of mental illness are disqualified from voting?" Most recently, the November 2000 ballot asked Maine voters: "Do you favor amending the Constitution of Maine to end discrimination against persons under guardianship for mental illness for the purpose of voting?" Because a majority of voters voted against these referendums, the disenfranchisement of those under guardianship for mental illness remains.

amendment, Maine's Constitution disenfranchised "paupers and persons under guardianship." (Chapter 34 of the Resolves of 1965 at 1065) (Attach. to State Defs. Mot. for Summ. J. (Docket # 41).) Through the 1965 amendment, Maine sought to limit its disenfranchisement of persons under guardianship to only those persons under guardianship due to mental illness.

*The Plaintiffs*

Plaintiffs Jane Doe, Jill Doe, and June Doe, are all women under guardianship by reason of mental illness. Through their public guardian, the Maine Department of Human Services ("DHS"), Plaintiffs brought this case claiming that the State of Maine has denied them the right to vote in violation of the Fourteenth Amendment as well as federal statute. The Disability Rights Center of Maine, Inc. not only represents the three named Plaintiffs but also is separately named as a Plaintiff in order to challenge Maine's voting restriction on behalf of other mentally ill persons under guardianship.

### A. Jane Doe

Jane Doe is a thirty-three year old resident of Limestone, Maine, who has been diagnosed with bipolar disorder.[4] Since 1987, she has been under full guardianship because of her mental illness. DHS has served as Jane Doe's appointed guardian since 1993. When Jane Doe was placed under full guardianship, the Probate Court did not specifically consider whether she had the capacity to vote. Additionally, the Probate Court did not notify her that as a result of the guardianship proceedings she might lose her right to vote.

Jane Doe wished to vote in the November 2000 election. Although she understood the nature and effect of voting such that she could make an individual decision regarding the candidates and questions on the ballot, the Maine Constitution prohibited Jane Doe from voting because she was under guardianship by reason of mental illness. Seeking to protect her right to vote, Jane Doe sought a preliminary injunction from this Court in October of 2000 (*See* Pls. Mot. for Prelim. Injunction (Docket # 2).) As a result of this litigation, Jane Doe learned that it was the position of the State of Maine that a person under full guardianship by reason of mental illness could vote if the Probate Court specifically reserved the individual's right to vote.

On October 31, 2000, Jane Doe filed an unopposed motion with the Aroostook County Probate Court requesting that her guardianship order be modified to allow her to vote. On November 3, 2000, Probate Judge Dunleavy granted the motion thereby reserving Jane Doe's right to vote although she was under full guardianship by reason of mental illness. According to the State of Maine, this modification made Jane Doe eligible to vote in the November 2000 election, although she remained under guardianship by reason of mental illness.

### B. Jill Doe

Jill Doe, a seventy-five year old resident of Bangor, Maine, has been diagnosed with bipolar disorder. In 1996, Jill Doe was placed under full guardianship because she was found to be incapacitated by her mental illness. During the guardianship proceedings, Jill Doe, through her representatives, argued that she was not incapacitated. Alternatively, Jill Doe ar-

---

4. Bipolar disorder is defined as "a recurrent mood disorder featuring one or more episodes of mania or mixed episodes of mania and depression." U.S. Dep't of Health and Human Services, Mental Health: A Report of the Surgeon General 246 (1999).

gued that the Probate Court should only subject her to a limited guardianship that would assure she took her medication. Despite these arguments, the Probate Judge appointed DHS as Jill Doe's full guardian. According to Jill Doe, no one raised the issue of her capacity to vote before placing her under full guardianship.

Similar to Jane Doe, Jill Doe sought to amend the conditions of her guardianship after learning that Maine would allow her to vote despite being under guardianship by reason of mental illness if the right to vote was specifically reserved by the Probate Judge. On November 1, 2000, Jill Doe filed an unopposed motion to revise her guardianship order with the Penobscot County Probate Court. In a sworn affidavit accompanying her motion, Jill Doe explained that she had voted in the past by absentee ballot not realizing that she was not allowed to vote. The substance of this affidavit strongly suggested that Jill Doe understood the nature and effect of voting such that she could make an individual choice about the candidates and questions on the ballot. That same day, Probate Judge Woodcock endorsed the motion, "Motion Denied under the provisions of Article II, Section I of the Constitution of the State of Maine." (Defs. SMF Sealed Attach. 2.) As a result, Jane Doe reasonably believed she was prohibited from voting in the November 2000 Election.

Dr. William Anderson, Jill Doe's attending psychiatrist since 1995, believes that Jill Doe has the mental capacity to understand the nature and effect of voting despite his belief that she does not have the capacity to make responsible decisions regarding her psychiatric treatment. Based on his detailed conversations with Jill Doe, Dr. Anderson reports that Jill Doe knows Maine law restricts her from voting although she genuinely wants to vote. Moreover, Dr. Anderson is of the opinion that Jill Doe is capable of making an individual choice when casting a ballot based on her own strongly held opinions.

### C. June Doe

June Doe, a sixty-eight year old resident of Bangor, Maine, has been diagnosed with intermittent explosive disorder, antisocial personality[5] and mild organic brain syndrome (secondary to encephalitis).[6] Since 1985, she has been under full public guardianship because of this diagnosis. In 1996, while under guardianship, June Doe earned a high school diploma or "GED."

The Probate Court did not notify June Doe that as a result of being under full guardianship for a mental illness she would lose her right to vote, nor did it specifically consider her capacity to vote. In fact, prior to learning that Maine law prohibited persons under guardianship for mental illness from voting, June Doe had voted in elections while she was under guardianship.

Unlike Jane Doe and Jill Doe, June Doe was unable to seek a modification of her guardianship order prior to the November 2000 election because she was hospitalized. Because she resides in Bangor, any motion to modify her guardianship would be considered by the same Penobscot County

---

5. According to the Diagnostic and Statistical Manual of Mental Disorder ("DSM–IV–TR"), "antisocial personality disorder is a pattern of disregard for, and violation of, the rights of others." DSM–IV–TR at 685 (4th ed.2000) (text revision).

6. Encephalitis is "an inflammation of the brain." Stedman's Medical Dictionary at 586 (27th ed.2000). "Organic brain syndrome" is a term used to describe "any of various disorders of cognition caused by permanent or temporary brain dysfunction and characterized especially by dementia." Am. Heritage Dictionary at 1239 (4th ed.2000).

Probate Judge who considered Jill Doe's motion to modify. Because Jill Doe's motion to modify was summarily denied, June Doe believes it would be futile for her to seek the same modification when she is similarly under guardianship because of a mental illness.

Dr. Roger Wilson, who has been June Doe's treating psychiatrist for more than twenty years, recently conducted a specific examination of June Doe to assess her capacity to understand voting. During the examination, June Doe was able to distinguish the various issues on the ballot and expressed a specific desire not to cast a vote as to some issues because "she did not want to vote on issues she did not know." (Dr. Roger M. Wilson Aff. ¶ 4 (Pls.Ex. 5).) As a result of that examination and his long history of treating June Doe, Dr. Wilson concluded that June Doe had the mental capacity to understand the nature and effect of voting such that she could make an individual decision with regard to candidates and questions on the ballot.[7]

### D. Disability Rights Center of Maine

Disability Rights Center ("DRC") is a non-profit corporation organized pursuant to Maine law that protects and advocates for the legal and civil rights of Maine residents with mental disabilities.[8]

### The Defendants

The State Defendants, who have filed the pending motion for summary judgment, include: Maine's State Attorney General G. Steven Rowe, in his official capacity, and Maine's Secretary of State Dan Gwadowsky, in his official capacity. Both the Maine Attorney General's Office and the Maine Secretary of State's Office receive federal funds.

Additionally, Donna Bernier, Registrar for the Town of Limestone, and Gail Campbell, Registrar for the City of Bangor, are named as Defendants in their respective official capacities (hereinafter "Municipal Defendants"). As the registrars for these municipalities, Municipal Defendants are responsible for determining whether an individual is eligible to vote in a Maine Election. Defendant Bernier has joined in State Defendants' Motion for Summary Judgment on the grounds that the claims against the Registrar for Limestone are now moot because Jane Doe has been reserved the right to vote. (*See* Docket # 49.) Defendant Campbell has taken no position on the pending cross

---

7. Based on his training and 32 years of experience, Dr. Wilson generally believes that a person under guardianship for a severe mental illness "is more likely to be monitored and receive treatment which will help restore him or her to capacity in areas such as voting" as compared to a similarly situated mentally ill person not under guardianship. (Dr. Roger M. Wilson Aff. ¶ 7 (Pls.Ex. 5).) Dr. Wilson's expert opinion captures what has been described as a "common phenomenon" among mental disorders. *Olmstead v. L.C. by Zimring*, 527 U.S. 581, 610, 119 S.Ct. 2176, 144 L.Ed.2d 540 (1999) (Kennedy, J., concurring) ("It is a common phenomenon that a patient functions well with medication, yet, because of the mental illness itself, lacks the discipline or capacity to follow the regime the medication requires.")

8. When Plaintiffs initially added DRC as a party, State Defendants objected on the basis of standing. State Defendants argued that the Court should ignore the standing objection for purposes of the preliminary injunction and take it up at a later date. The Court notes that State Defendants have not continued to press this standing argument. (*See* Second Am. Compl. ¶¶ 8 & 9 (Docket # 29) and State Defs. Answer to Second Am. Compl. ¶¶ 8 & 9 (Docket # 33).) Moreover, the Court is satisfied that DRC has standing for the same reasons articulated in *Risinger v. Concannon*, 117 F.Supp.2d 61, 68–71 (D.Me. 2000) (finding DRC had associational standing to sue on behalf of minors with mental health impairments).

motions for summary judgment. (See Docket # 50.)

In addition to a description of the parties, the Court must provide some factual background regarding how Maine's voting restriction has worked in practice and would work according to State Defendants' proffered narrowing constructions. Thus, the Court below briefly explains Maine guardianship proceedings, which are conducted pursuant to Maine's Probate Code, 18–A M.R.S.A. § 1–101 et seq. Then, the Court briefly lays out how Maine has previously applied its voting restriction to those wards who are under guardianship by reason of mental illness and contrasts that application with the State's newly proffered interpretation of the same voting restriction. This background will lay the foundation for the Court's discussion of legal issues in dispute.

*"Under Guardianship" Pursuant to Maine's Probate Code*

Under Maine's Probate Code, the Probate Court is directed to make appointments or other orders only "to the extent necessitated by the incapacitated person's actual mental and adaptive limitations . . . ." 18–A M.R.S.A. § 5–304(a). To fulfill this directive, there are provisions for both full and limited guardianship for "incapacitated persons."[9] See 18–A M.R.S.A. §§ 5–105 & 5–304. The Probate Code defines "incapacitated person" as a person "who is impaired by reason of mental illness, mental deficiency, physical illness or disability, chronic use of drugs, chronic intoxication or other cause except minority to the extent he lacks sufficient understanding or capacity to make or communi-

cate responsible decisions concerning his person." 18–A M.R.S.A. § 5–101(1).

When an interested person files a petition to place an allegedly incapacitated person under guardianship, the person nominated to serve as guardian must file a guardianship plan detailing how the ward's personal housing, medical, financial and social needs will be met. See 18–A M.R.S.A. § 5–303(a). Upon receiving a petition for guardianship, a probate court appoints the allegedly incapacitated person a visitor or guardian ad litem. See id. § 5–303(b). The appointed visitor or guardian ad litem then meets with the allegedly incapacitated person to explain the potential consequences of guardianship, including the aspects of the guardianship plan. In addition to this in-person meeting, the allegedly incapacitated person is served a written notice of the hearing on the pending petition. See id. § 5–309(b).

After conducting an investigation that includes meeting with the allegedly incapacitated person and the proposed guardian, the appointed visitor or guardian ad litem must determine whether the person wishes to attend the hearing and/or contest any aspect of the guardianship. See id. § 5–303(c). If the proposed ward does wish to contest any aspect of the petition for guardianship, the Probate Court may appoint an attorney to represent the individual. See id. § 5–303(b). Ultimately, the appointed visitor or guardian ad litem files a written report with the probate court.

At the hearing, the burden is on the party filing the petition to prove by a preponderance of the evidence that the proposed ward is, in fact, incapacitated and that the appointment of a guardian "is a

---

9. Incapacitated persons subject to limited guardianship "retain[ ] all legal and civil rights except those which have been suspended in the decree or court order." 18–A M.R.S.A. § 5–105. Thus, an incapacitated person under limited guardianship because of mental illness retains his or her right to vote, unless that right is specifically suspended by the Probate Court.

necessary or desirable means of providing continuing care and supervision of the person." 18–A M.R.S.A. § 5–304(b). *See Guardianship of Hughes,* 715 A.2d 919, 922 (Me.1998) (concluding that a preponderance of the evidence standard in guardianship proceedings satisfied the constitutional requirement of due process).

Since the beginning of this case, the State of Maine has taken the position that a probate judge has the power to specifically reserve or deny the right to vote to any ward.[10] Under the current Probate Code, however, Maine probate judges appear to disagree over their authority to reserve the right to vote to a person placed under full guardianship by reason of mental illness.[11] Apparently, some probate judges, such as Aroostook County Probate Judge Dunleavy, believe they can reserve a person under full guardianship by reason of mental illness the right to vote.[12] Meanwhile, other probate judges, such as Penobscot County Probate Judge Woodcock, believe that the Maine Constitution prevents them from reserving mentally ill persons under guardianship the right to vote, even when it is specifically requested and unopposed.[13]

Currently, individuals with mental illnesses who are the subject of guardianship proceedings are not specifically advised that they could be disenfranchised if they are placed under full guardianship. Moreover, while the State says that the capacity to vote could be specifically addressed during guardianship proceedings, there is no suggestion that the current procedure requires probate judges to consider the capacity to vote when a person is facing the prospect of being disenfranchised as a result of the proceedings. Rather, under the current system, it appears that the probability of a mentally ill person under guardianship having the right to vote reserved depends more on the individual probate judge hearing the case than on the ward's actual capacity to understand the nature and effect of voting.

*"By Reason of Mental Illness"*

One of the major points of dispute between the parties in this case is the appro-

---

**10.** As discussed below, State Defendants now assert that probate judges not only have the authority to specifically consider a mentally ill ward's right to vote, but also that probate judges have a *duty* to specifically consider an individual's capacity to vote and to disenfranchise only those who are found to lack the requisite capacity to understand the nature and effect of voting. By adopting this burden shifting with regard to voting rights, State Defendants appear to erase the difference between full guardianship and limited guardianships. *See supra* note 9 (describing limited guardianships).

**11.** State Defendants represent in their filings that this matter was going to be specifically discussed by the probate judges at a March 15, 2001 meeting. State Defendants have not provided the Court with any further information on the outcome of this March 15th discussion. Thus, the Court can only assume that the disagreement among the probate judges remains.

**12.** Kennebec County Probate Judge Mitchell also believes it is within his authority to reserve the right to vote to any ward.

**13.** Probate Judge Woodcock's definitive reading of Article II, Section I of Maine's Constitution is clear upon comparison of his denial of Jill Doe's unopposed motion for modification of guardianship with his November 3, 2000 ruling on the unopposed motion to amend guardianship in *Estate of Russell Holt.* In the later case, Holt similarly requested a specific amendment reserving him the right to vote. Probate Judge Woodcock issued an order finding that Holt "is not under guardianship for reasons of mental illness" but "is under guardianship by reason of mental deficiency, to wit: mild mental retardation." *(See* Aff. of Arthur Keenan (Attorney for Russell Holt) (Pls.Ex. 6).) Interestingly, this ruling makes no specific findings regarding Holt's capacity to understand the nature and effect of voting in light of his mild mental retardation.

priate definition of "mental illness." When the Maine Constitution was amended in 1965, the Legislature did not provide a specific definition for "mental illness." Additionally, Maine's Probate Code does not offer a specific definition of "mental illness." It does, however, list both "mental illness" and "mental deficiency" as separate causes of incapacity. *See* 18-A M.R.S.A. § 5-101(1).

In implementing Maine's voting restriction over the past twenty years, the Secretary of State apparently has adopted a rather narrow definition of mental illness. In a March 31, 1980 letter from then-Deputy Secretary of State James Henderson, to municipal clerks and registrars, the Deputy Secretary explained that

The only restriction in Maine law . . . is as follows: "A person under guardianship for reasons of mental illness may not register or vote at any election."

These are the only people, who otherwise meet the voting qualifications of age, citizenship and residence, who may not register or vote. Therefore, a person otherwise qualified, who is mentally ill but not under guardianship for that illness, may register and vote. A person otherwise qualified, who is under guardianship for any reason except that of mental illness is also eligible to register and vote. People who appear to be "senile", "retarded", or have some other physical or mental handicap are also eligible to vote.

(Pls. Ex. 2 (Attach. to Dep. of Sec'y of State Dan Gwadosky (Pls.Ex. 14)).) The Office of the Maine Secretary of State adopted a similar position in its "Guide to Voter Registration Laws and Procedures" provided to municipalities in 1999. The Guide states, in relevant part,

A person under guardianship because of mental illness may not register to vote in any election, as provided in the Con-

stitution of Maine, Article II, Section I. Before the registrar may restrict a person from registering, the registrar should request documentation of the guardianship in the form of a court order. The law does not restrict people under guardianship for reasons other than mental illness from voting.

(Pls. Ex. 7 at 8 (Attach. to Dep. of Secretary of State Dan Gwadosky (Pls.Ex. 14)).)

As a result of this guidance from the Secretary of State's Office, the registrars for both Bangor and Limestone agreed that they would only restrict a person from voting if the court order placing them under guardianship says they are under guardianship for "mental illness." Pursuant to this interpretation of Maine's voting restriction, it is apparently left to the discretion of the probate judge to put a person under guardianship for "mental illness" rather than list another basis for guardianship. *See* 18-A M.R.S.A. § 5-101(1) (listing the various reasons for impairment that justify placing a person under guardianship).

Although this rather narrow view of "mental illness" has guided the application of Maine's voting restriction for at least the last twenty years, State Defendants now realize that this interpretation disenfranchises an arbitrarily defined group of citizens, thereby raising problems of a constitutional dimension. Thus, State Defendants now advocate for a broad definition of "mental illness" that disenfranchises anyone under full guardianship by reason of not only a psychiatric mental illness, but also mental retardation or other unsoundness of mind. Although they now advocate for that position in this case and have advised the Secretary of State to change its advice regarding the application of the voting restriction, there is no evidence that State Defendants have taken any steps to advise or educate municipal officials as to

this new interpretation. Additionally, it does not appear that State Defendants indicated to Maine voters, who had reiterated their approval for restricting voting by persons under guardianship due to mental illness in 1997 and again in 2000, that "mental illness" was subject to the broad interpretation. *See supra* note 3.

*Another Change in Position*

Having done their legal research, State Defendants apparently are now aware of the various constitutional infirmities that afflict Maine's voting restriction. In a last-ditch effort to save the provision, State Defendants have offered multiple radical changes in interpretation. Thus, in addition to a newly adopted broad definition of "mental illness," State Defendants also suggest dramatic changes in probate procedure with regard to a ward's voting rights.

Initially, when the individual Plaintiffs appeared before this Court seeking a preliminary injunction allowing them to vote in the November 2000 election, the State Attorney General took the position that

> Maine's prohibition on voting by persons under guardianship due to mental illness ... does not apply if the incapacitated person is subject to full guardianship but the court order appointing the guardian explicitly reserves the individual's right to vote. *(See* Andrew Ketterer Aff. ¶ 3 (Defs.Ex. 3).) Therefore, Maine's voting prohibition applies only to those persons under full guardianship by reason of mental illness who do not have their right to vote specifically reserved.

(Findings of Fact & Conclusions of Law at 5 (Docket # 16).)

In accordance with this interpretation, two individual Plaintiffs, Jane Doe and Jill Doe sought unopposed modifications of their guardianship orders reserving their right to vote. They received contradicting decisions. In the case of Jane Doe, the order was modified allowing her the right to vote in the November 2000 election. In the case of Jill Doe, the modification was denied thereby denying Jill Doe the right to vote in the same election.

Now, State Defendants have adopted a new interpretation. As explained in the most recent round of motion filings,

> State Defendants believe Article II, Section I of the Maine Constitution should be construed to mean that a ward retains the right to vote unless and until it is expressly suspended by a judicial officer in a guardianship proceeding based upon a finding that the ward lacks the mental capacity to understand the nature and effect of the act of voting. Thus, State Defendants have no objection and, in fact, would urge the Court to issue a judgment declaring that Plaintiffs Jill Doe and June Doe retain the right to vote unless that right has been expressly suspended by a judicial officer in a guardianship proceeding at which it has been determined that the ward lacks the mental capacity to understand the nature and effect of the act of voting.

(State Defs. Resp. to Pls. Mot. for Summ. J. at 17 (Docket # 53).) [14] Under this interpretation, Jane Doe, Jill Doe and June Doe would all retain the right to vote

---

**14.** While the Court appreciates State Defendants' somewhat belated epiphanies with regard to due process protections, Plaintiffs Jill Doe and June Doe (along with the other individuals under full guardianship for mental illness) undoubtedly would have appreciated the State adopting this position when their motion for preliminary injunction was pending and prior to November 7, 2000, thereby allowing them to vote in the historic 2000 Election, which included a referendum vote on the portion of the Maine Constitution at issue in this case.

without seeking a modification of their respective guardianships. In fact, because it appears that no guardianship orders currently include an express suspension of the right to vote, the immediate result of endorsing this new interpretation would be that all persons under guardianship would have the right to vote regardless of whether they lack the capacity to understand the nature and effect of voting. It is not clear that either the Maine courts or the Maine Legislature would endorse State Defendants' unique interpretation of Maine law.

## III. DISCUSSION

Plaintiffs claim that under all of the State Defendants' proffered and applied interpretations, Maine's disenfranchisement of those under guardianship by reason of mental illness fails to provide adequate procedural due process and violates the Equal Protection Clause. Additionally, Plaintiffs claim that Maine's voting prohibition discriminates against individuals with mental disabilities in violation of Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq.*, and Section 504 of the Rehabilitation Act, Pub.L. No. 93–112, 87 Stat. 355 (1973) (codified as amended in scattered sections of Title 29 of the U.S.C.). The Court addresses each of these claims below. However, it is appropriate to begin this discussion by outlining some principles of statutory construction that will guide the Court's analysis.

### A. Interpreting Maine's Voting Restriction

▮▮▮. Defendants' radical changes in interpretation, both as to the definition of mental illness and as to the increased due

process protections built into guardianship proceedings, seek to avoid the constitutional infirmities that lie at the heart of Plaintiffs' equal protection and due process claims. Pursuant to both federal and state law, this Court should narrowly interpret any state enactment to avoid constitutional problems whenever such a narrowing construction can be fairly and readily adopted. *See Erznoznik v. Jacksonville,* 422 U.S. 205, 216, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975) ("[A] state statute should not be deemed facially invalid unless it is not readily subject to a narrowing construction by the state courts"); *Nat'l Pharmacies, Inc. v. Feliciano–de–Melecio,* 221 F.3d 235, 241–42 (1st Cir.2000); *Stewart v. Durham,* 451 A.2d 308, 310–11 (Me.1982); *State v. Davenport,* 326 A.2d 1, 6 (Me.1974) ("The cardinal principle of statutory construction is to save, not to destroy.") (citing *NLRB v. Jones & Laughlin Steel Corp.,* 301 U.S. 1, 30, 57 S.Ct. 615, 81 L.Ed. 893 (1937)).[15]

With this guiding principle in mind, the Court construes Article II, Section I of the Maine Constitution in conjunction with its implementing state statute. *See* ME. CONST. art. 2 § 1; 21–A M.R.S.A. § 115(1). Recent decisions from the Maine Law Court provide guidance on construing the language of Maine statutes. Generally, the Law Court has explained,

When we construe a statute, we first look to the plain meaning of the language to determine the legislative intent. Only if the language is ambiguous do we resort to extrinsic evidence to glean the statutory intent. In the absence of a legislative definition, the term

---

**15.** At the same time, "a federal court may not slice and dice a state law to 'save' it; [the court] must apply the Constitution to the law the state enacted and not attribute to the state a law [the court] could have written to avoid the problem." *K–S Pharmacies, Inc. v. Am.*

*Home Prods. Corp.,* 962 F.2d 728, 730 (7th Cir.1992) (citing *Am. Booksellers Ass'n v. Hudnut,* 771 F.2d 323, 332–34 (7th Cir.1985), *aff'd without opinion,* 475 U.S. 1001, 106 S.Ct. 1172, 89 L.Ed.2d 291 (1986)).

must be given a meaning consistent with the overall statutory context and must be construed in light of the subject matter, the purpose of the statute and the consequences of a particular interpretation. We avoid statutory constructions that create absurd, illogical or inconsistent results.

*Brent Leasing Co., Inc. v. State Tax Assessor,* 773 A.2d 457, 459 (Me.2001) (internal quotations and citations omitted). In determining a term's plain meaning in the absence of a legislative definition, the Law Court has endorsed the use of dictionaries. *See Rockland Plaza Realty Corp. v. City of Rockland,* 772 A.2d 256, 260 (Me.2001).

By its plain language, Maine's Constitution seeks to disenfranchise those "under guardianship by reason of mental illness:" Thus, the restriction targets a subset of incapacitated persons under guardianship—those with mental illnesses. It similarly targets a subset of mentally ill persons—only those under guardianship.

Recently, Maine voters have twice reaffirmed this amendment to the Maine Constitution based solely on this plain language and any knowledge that they might have had regarding the State's narrow application of the provision. In examining Plaintiffs' constitutional claims below, the Court similarly relies solely on the plain language and past application of Maine's disenfranchising provision to decide the "as applied" portion of Plaintiffs' claims. The Court then considers the viability of Maine's newest proffered interpretations when considering Plaintiffs' facial challenges to the voting restriction in light of the principles of statutory construction laid out above. *See Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 495 n. 5, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982) ("In evaluating a facial challenge to a state law, a federal court must ... consider any limiting construc-

tion that a[n] ... enforcement agency has proffered.").

## B. Procedural Due Process (Count IV)

Plaintiffs' procedural due process claim alleges that during guardianship proceedings (1) the State does not give notice or an opportunity to be heard on the issue of voting and (2) the State does not apply an appropriate burden of proof in guardianship proceedings, which can result in an individual losing his or her fundamental right to vote.

Both parties agree that Plaintiffs' arguments must be examined through the balancing test articulated in *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). Because of this apparent agreement, the parties do not discuss what liberty or property interest gives rise to Plaintiffs' due process claim. *See Lehr v. Robertson,* 463 U.S. 248, 256, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983) (explaining that examination of a due process claim begins with "a determination of the precise nature of the private interest that is threatened by the State"). In fact, various courts have recognized that the fundamental nature of the right to vote gives rise to a liberty interest entitled to due process protection. *See, e.g., Raetzel v. Parks/Bellemont Absentee Election Bd.,* 762 F.Supp. 1354, 1357 (D.Ariz.1990) ("Because voting is a fundamental right, the right to vote is a 'liberty' interest which may not be confiscated without due process."); *United States v. Texas,* 252 F.Supp. 234, 250 (W.D.Tex.1966) (discussing the other rights protected by due process and finding that the right to vote is entitled to the same protection because as a fundamental right it is "included within the concept of liberty"), *aff'd per curiam,* 384 U.S. 155, 86 S.Ct. 1383, 16 L.Ed.2d 434 (1966) (mem.) (citing *Harper v. Virginia State Bd. of Elections,* 383 U.S. 663, 86 S.Ct. 1079, 16

L.Ed.2d 169 (1966)), *see also Griffin v. Burns,* 570 F.2d 1065, 1074–75, 1077–78 (1st Cir.1978) (explaining in a different context that due process may be implicated by fundamentally unfair election procedures).

■ Thus, the Court bases its due process analysis on a finding that the denial of the right to vote is a denial of a fundamental liberty. An examination of procedural due process is particularly appropriate in this case because the State has chosen to categorically define as ineligible to vote a subset of persons subject to guardianship proceedings. When the State chooses to use such proceedings as the basis for the denial of a fundamental liberty, an individual is entitled to basic procedural protections that will ensure "fundamental fairness." *Lassiter v. Dep't of Social Servs.,* 452 U.S. 18, 24, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981) (explaining that due process "expresses the requirements of 'fundamental fairness' ").

■ Pursuant to the balancing test articulated in *Mathews v. Eldridge,* the Court examines the sufficiency of the procedures used to disenfranchise Maine voters by weighing: (1) Plaintiffs' interest in participating in the democratic process through voting; (2) the risk of erroneous deprivation of the right to vote under the procedures used by the State; and (3) the State's interest, including any extra administrative or financial burden on the State from requiring additional procedures. *See id.* at 335, 96 S.Ct. 893. In conducting this inquiry, the Court must focus on striking a balance that will minimize the risk of the State erroneously disenfranchising persons who have the capacity to vote. *See Heller v. Doe,* 509 U.S. 312, 332, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993) ("At least to the extent protected by the Due Process Clause, the interest of a person subject to governmental action is in the accurate de-termination of the matters before the court, not in a result more favorable to him."). Below, the Court considers the due process currently afforded to persons facing disenfranchisement as a result of guardianship proceedings (the "as applied" challenge) and then considers the new procedure suggested by State Defendants (the "facial" challenge).

### 1. As Applied

■ Weighing all of the *Mathews* factors, it is clear that the procedures utilized by Maine's probate courts in the past have failed to give Plaintiffs adequate due process. Specifically, Plaintiffs were not given notice that as a result of the guardianship proceeding they would be disenfranchised. *See Armstrong v. Manzo,* 380 U.S. 545, 550, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965) (explaining that failure to give notice violates "the most rudimentary demands of due process of law.") As a result of this lack of notice, many mentally ill persons facing guardianship proceedings were unaware of the ramifications of such proceedings on their fundamental right to vote. This result is clearly displayed by the evidence suggesting that some persons under guardianship for mental illness, in fact, continued to vote while under guardianship.

The lack of notice, in turn, led to an inadequate opportunity to be heard. As a result, mentally ill persons subject to guardianship proceedings faced a high risk of being disenfranchised regardless of their capacity to understand the nature and effect of voting. Thus, pursuant to the second *Mathews* factor, the Court finds that the State's procedures or lack thereof resulted in a high risk of erroneous deprivation of the fundamental right to vote.

By comparison, specific notice regarding the right to vote would give proposed

wards an opportunity to contest this aspect of guardianship. Balancing all of the relevant *Mathews* factors, the Court concludes that due process requires that the State elevate the right to vote to the same level of notice and opportunity for hearing that is provided for all other aspects of guardianship.[16] Due process requires no more and no less in order to minimize the risk of erroneous disenfranchisement.

The Court's consideration of the burden on the State, the third *Mathews* factor, finds that providing specific notice as to the potential disenfranchising effect of guardianship proceedings along with an opportunity to contest this specific aspect of guardianship would not be overly burdensome on the State. In light of the procedures already in place to protect persons subject to guardianship proceedings, it would be fairly simple to incorporate a specific notice regarding the right to vote.

It is true that as a result of this notice probate courts may be faced with an increased administrative burden as a result of people contesting this aspect of full guardianship. However, any increased burden at the initial guardianship proceeding may actually result in fewer people returning to probate court for modifications of their guardianship orders. Thus,

the end result may well be simply a shifting of the administrative burden on the probate courts. Additionally, the Court notes that by providing clear notice and a meaningful opportunity to be heard on the issue of voting at this early stage, the State can lessen the administrative burden on municipal registrars who currently are burdened with the difficult task of determining when a guardianship order makes a person ineligible to vote. In the end, the Court believes that specific notice has the potential to decrease the overall administrative burden on the State while ensuring affected wards a meaningful opportunity to be heard.

Thus, balancing all of the *Mathews* factors, the Court finds that, as applied, Maine's current guardianship procedures have failed to provide adequate due process before denying Plaintiffs the right to vote.

2. Facial Validity [17]

■ As the Court has previously explained, Defendants have proffered a new procedure for the consideration of capacity to vote during guardianship proceedings that they believe would comply with due process. During this litigation, the Court previously has adopted many of Maine's

16. Currently, the State does provide notice to a proposed ward that they are facing guardianship proceedings both in writing and through an in-person meeting with an appointed visitor. Through the guardianship plan, proposed wards are advised about the petitioner's plans for their individual housing, medical, financial and social needs. Thus, it appears that proposed wards are notified of plans that may affect their other fundamental liberties. However, nothing about this notice is reasonably calculated to advise proposed wards that they may be disenfranchised.

17. In *United States v. Salerno*, 481 U.S. 739, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987), the Supreme Court explained, "A facial challenge to a legislative act is, of course, the most

difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *Id.* at 745, 107 S.Ct. 2095. This "no set of circumstances" test has come under question in recent years. *See, e.g., City of Chicago v. Morales*, 527 U.S. 41, 55 n. 22, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999); *see also Pharm. Research and Mfrs. of Am. v. Concannon*, 249 F.3d 66 (1st Cir.2001) (Keeton, J., concurring) (citing two opinions by Justice Stevens criticizing *Salerno*'s "no set of circumstances" test). Because the First Circuit has continued to endorse the application of the "no set of circumstances" test, *see id.* at 77, the Court applies the test in examining Plaintiffs' facial challenges.

proffered narrowing constructions that appeared to be both reasonable and constitutional.[18] State Defendants now advocate for an even "narrower construction" that will require a petitioner to specifically seek to disenfranchise a proposed ward, thereby providing notice. According to State Defendants, probate judges would then be required to make specific findings regarding a ward's incapacity to vote before expressly suspending a ward's franchise.

Under this new proposed procedure, if a petitioner does not specifically seek to disenfranchise a proposed ward, the ward retains the right to vote. However, once the petitioner raises the issue of voting, the probate judge would be required to specifically consider the proposed ward's capacity to vote before restricting the ward's right to vote. In light of the Court's consideration of the *Mathews* factors above, it is fairly clear that this "narrowing construction" substantially broadens the procedural protections and provides more than adequate due process.

Nonetheless, the State has taken no steps to actually adopt this innovative procedure and it appears that at least some Maine probate judges harbor doubts about their authority to specifically consider and reserve the right to vote absent some legislative amendment.[19] Under these circumstances, the Court finds that State Defendants' proposal is not simply a fair narrowing construction that avoids a finding of procedural due process deficiencies. Rather, it is an amendment to substantive state law that appears to exceed the requirements of due process; such an amendment is more properly undertaken by either the Maine Legislature or Maine voters through the referendum process—not by a federal court at the suggestion of the State Attorney General. In short, the Court concludes that State Defendant's "narrowing construction" cannot be fairly and readily adopted by this Court.

■ Thus, the Court finds that no fair and reasonable reading of Maine's current guardianship provisions ensures uniformly adequate notice regarding the potential disenfranchising effect of being placed under guardianship for a mental illness. As a result of this procedural deficiency, State Defendants have failed to provide Plaintiffs sufficient due process prior to depriving them of the right to vote. The Court further concludes that, under all circum-

---

18. For example, at the preliminary injunction stage, the Court found that Maine's voting restriction did not apply to persons under *limited* guardianships due to *mental illness* and that persons under full guardianship could have their right to vote reserved by a probate judge pursuant to 18–A M.R.S.A. § 5–304(a). (*See* Findings of Fact and Conclusions of Law at 5 (Docket # 16).) Thus, the Court fairly and narrowly interpreted Maine's voting prohibition to apply only to those persons under full guardianship for mental illness who did not have their right to vote specifically reserved. The Court again endorsed this narrow reading in its Order on Defendants' Motion to Certify (Docket # 35). The Court notes that some probate judges apparently disagree that even this narrow reading is a fair interpretation of Article II, Section I of Maine's Constitution.

19. In fact, the evidence before the Court paints a picture of probate courts adopting a variety of procedures as well as opposing interpretations of Maine's voting restriction in light of existing probate law. While all of the probate courts appear to be operating within their discretion as they struggle to reconcile Maine's guardianship law with the voting restriction, there is undoubtedly a troubling disparity when similarly situated wards have different fundamental rights. While the Court finds that none of the currently utilized procedures provide adequate due process before depriving wards the right to vote, adoption of uniform procedures that satisfy due process requires legislative, rather than judicial, action.

stances, Maine's current voting restriction deprives mentally ill persons subject to guardianship proceedings of the right to vote without adequate notice and an opportunity to be heard in violation of the Due Process Clause of the Fourteenth Amendment.[20]

## C. Equal Protection (Count I)

■ According to the Supreme Court, "once the franchise is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment." *Harper v. Virginia State Bd. of Elections,* 383 U.S. 663, 665, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966); *see also Bush v. Gore,* 531 U.S. 98, 104–05, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000) (affirmatively citing the above quoted portion of *Harper* ). The Court recognizes at the outset that Maine's voting restriction may very well have constituted equal treatment when it was passed in 1965. Nonetheless, this historical perspective does not guide the Court's inquiry. See *Harper,* 383 U.S. at 669, 86 S.Ct. 1079 ("Notions of what constitutes equal treatment for purposes of the Equal Protection Clause do change."). Rather, present day understandings of equal treatment must guide the Court's scrutiny of the voter eligibility lines drawn by the State of Maine.

For purposes of summary judgment, both parties agree that Maine's restriction on voting is subject to strict scrutiny because it restricts a fundamental right. *See Dunn v. Blumstein,* 405 U.S. 330, 337, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972) ("[I]f a challenged statute grants the right to vote to some citizens and denies the franchise to others, 'the Court must determine whether the exclusions are necessary to promote a compelling state interest.'") (*quoting Kramer v. Union Free Sch. Dist.,* 395 U.S. 621, 627, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969)). Additionally, for purposes of summary judgment, the parties agree that Maine has a compelling state interest in ensuring that "those who cast a vote have the mental capacity to make their own decision by being able to understand the nature and effect of the voting act itself." (Defs. Mot. for Summ. J. at 8 (Docket # 41).) The only question left for the Court to resolve is whether Maine's restriction is narrowly tailored to meet this compelling interest.

To fully comply with the Equal Protection Clause, Maine's provision must be both valid "as applied" and "facially valid." In both respects, the Court must examine whether the ends—excluding persons who lack the capacity to understand the nature and effect of voting such that they cannot make an individual choice—justify the means—excluding persons under guardianship by reason of mental illness. Strict

---

**20.** Plaintiffs also argue that due process requires the application of the clear and convincing standard of proof rather than the preponderance of the evidence standard. In *Guardianship of Hughes,* 715 A.2d 919 (Me. 1998), the Law Court addressed this argument and found that the application of the preponderance of the evidence standard did comport with due process as explicated in *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). Plaintiffs have not brought to the Court's attention any case law suggesting the Maine Law Court's holding in *Hughes* improperly applied the *Math-*

*ews* balancing test. Moreover, as indicated in the discussion above, the Court concludes that due process simply requires the State to elevate the right to vote to the same level of notice and consideration given to all other fundamental rights affected by guardianship proceedings. This same analysis applies to the burden of proof. Therefore, the Court concludes that the *Hughes* decision reflects a thorough consideration of the appropriate burden of proof and concurs that a decision to raise the burden of proof is best left to the Maine Legislature. *See Hughes,* 715 A.2d at 923 & n. 1.

scrutiny demands a truly necessary correlation between the ends and the means.

### 1. As Applied

It is clear from the evidence before the Court that Defendants have applied Maine's constitutional provision to disenfranchise only those under guardianship for psychiatric diagnoses. Since 1980, municipal officials routinely have been advised that a person under guardianship because of mental retardation should be allowed to vote regardless of whether the individual's mental condition adversely impacts his or her ability to understand the nature and effect of the act of voting such that the person cannot make an individual choice about the matters on the ballot.

Thus, in practice, Maine has construed the phrase "mental illness" to exclude only those with traditional psychiatric disorders from voting, while permitting incapacitated persons diagnosed with mental retardation or senility to vote as they choose. State Defendants now admit that this narrow, but nonetheless common, definition of the term 'mental illness' "produces a result that renders Article II, Section I arbitrary and irrational, in that it singles out, for no legitimate basis, people with psychiatrically based diagnos[e]s as opposed to all those who may be under guardianship for reasons of mental incapacity." (State Defs. Resp. to Pls. Mot. for Summ. J. at 10 (Docket # 53).) The Court agrees.

As displayed by the evidence, there is little to no correlation between the State's interest and the disenfranchisement of Jill Doe and June Doe, two women who suffer from mental illness but, according to their physicians, understand the nature and effect of the act of voting. Moreover, while Maine claims to have a compelling interest in ensuring that all those who cast a ballot understand the nature and effect of voting such that they can make an individual decision, it has allowed incapacitated persons afflicted with mental retardation and other mental deficiencies to vote regardless of whether or not they possess the ability to understand the nature and effect of voting. In short, the State has disenfranchised a subset of mentally ill citizens based on a stereotype rather than any actual relevant incapacity. Such state action cannot survive strict scrutiny because there is no factually valid correlation between the ends and the means. Thus, it is clear that, as applied, Article II, Section I of Maine's Constitution violates the Equal Protection Clause.

### 2. Facial Validity [21]

█ In light of State Defendants' new interpretation of Maine's disenfranchising provision, the Court must determine whether Maine's voting restriction is facially valid. Plaintiffs argue that even under the State's proffered interpretation, Article II, Section I of the Maine Constitution cannot survive strict scrutiny.

In an effort to tailor Maine's voting restriction to meet the State's compelling interest, State Defendants now suggest that the term "mental illness" was intended to apply to all mental incapacities. To support this broad definition of mental illness, State Defendants rely on legislation passed by the Maine Legislature in 1959. In relevant part, the legislation stated that

> Wherever in the Revised Statutes or public laws or private and special laws

---

**21.** *See supra* note 17. While a facial challenge requires the Court to apply the "no set of circumstances" test, Plaintiffs' equal protection claim requires the Court to apply strict scrutiny. Viewing this case through both of these lenses, the Court must determine whether there are no circumstances under which the State's voting restriction could be considered narrowly tailored to meet the State's compelling interest.

the words "insane" or "insanity" appear, they shall be amended to the words 'mentally ill' and 'mental illness' except in all circumstances where the word "insane" is in reference to the word criminal.

Maine P.L.1959, c. 242, § VIII. Because the Maine Legislature had declared five years earlier that " 'insane person' may include idiotic, non compos, lunatic or distracted person," State Defendants contend that in 1959 the Maine Legislature meant for the term "mentally ill" to apply to all idiotic,[22] non compos,[23] lunatic[24] or distracted[25] persons.[26] *See* R.S.1954, c. 10 § 22(VII) (codified at 1 M.R.S.A. § 72(8) (repealed 1977)). State Defendants argue that the Court should extend this logic to 1965 and then freeze the definition of mental illness to the definition that they have deduced from this 1950s Maine legislation.[27]

In light of the Legislature's failure to provide a specific definition of "mental illness" in 1965 as well as the manner in which the recent referendum votes were conducted, the Court is skeptical that State Defendants can now freeze the definition of "mental illness" to one meaning apparently endorsed by the Maine Legislature in 1959. Moreover, adopting this definition creates illogical and inconsistent results.

First, the State's proffered definition of mental illness encompasses other bases for placing a person under guardianship, such as "mental deficiency." *See* 18–A M.R.S.A. § 5–101(1). Thus, the State's proffered definition encompasses and overlaps with other listed reasons for incapacity leaving other terms in the Probate Code meaningless.[28] Second, State Defendants suggest that it was the intention of the Maine Legislature to include persons with mental retardation in their definition of

**22.** The term "idiot" is defined in relevant part as "[a] person of profound mental retardation having a mental age below three years and generally being unable to learn connected speech or guard against common dangers. The term belongs to a classification system no longer in use and is now considered offensive." Am. Heritage Dictionary at 871 (4th ed.2000).

**23.** The dictionary defines the Latin phrase "non compos mentis" as "not of sound mind and hence not legally responsible; mentally incompetent." Am. Heritage Dictionary at 1196 (4th ed.2000).

**24.** The dictionary defines "lunacy" as "[i]nsanity, especially insanity relieved intermittently by periods of clear-mindness." Am. Heritage Dictionary at 1041 (4th ed.2000).

**25.** In relevant part, "distracted" is defined as "suffering from conflicting emotions; distraught." Am. Heritage Dictionary at 525 (4th ed.2000).

**26.** Discussing this same statutory description of "insanity," the Maine Law Court explained that "there are many degrees and varieties of

mental derangement which come under the generic head of insanity.... Insanity, in a legal sense, embraces all the groups and conditions.... In a legal sense, unsoundness of mind is synonymous with insanity." *St. George v. Biddeford*, 76 Me. 593, 595–96 (1885). Thus, State Defendants embrace the term "unsoundness of mind" as synonymous with "mental illness."

**27.** State Defendants' historical justification for broadly defining mental illness is especially perplexing in light of their desire to apply their "2001 interpretation" to the phrase "under guardianship" for the purpose of the voting restriction.

**28.** According to the registrars' testimony, they would only exclude persons from voting if their guardianship orders include the phrase "mental illness." Under the State's broad definition of mental illness, a probate judge is left with complete discretion to put "mental illness" or "mental deficiency" or some other factually supported basis for finding incapacity and thereby include or exclude a person from voting.

"mental illness." However, the Maine Legislature has explicitly laid out the "Rights of Persons with Mental Retardation or Autism" including the right to vote. *See* 34–B M.R.S.A. § 5605(5) ("A person with mental retardation or autism may not be denied the right to vote for reasons of mental illness, as provided in the Constitution of Maine, Article II, Section 1, unless under guardianship."); *see also* Carroll M. MacGowan Jr. Aff. ¶¶ 10–12 (Pls.Ex. 7) (explaining some of the history leading to the original 1970s passage of the above quoted statutory provision). Thus, it appears the Maine Legislature does distinguish persons with mental retardation from persons with mental illness. *Cf.* 19–A M.R.S.A. § 701(3) (providing distinctive definitions of "mental illness" and "mental retardation" in the context of prohibited marriages).

Additionally, by defining mental illness through the use of archaic terms, the State somehow suggests that probate courts can properly place persons with modern day diagnoses within the stigmatizing confines of terms such as "idiotic," "lunatic," or "unsoundness of mind." Thus, while attempting to develop a narrowing construction that takes Maine one step forward, State Defendants actually take two steps back. In fact, State Defendants need not look back to 1959 to find a broad definition of mental illness. In 1999, the United States Department of Health and Human Services released the first Surgeon Gener-

al's Report on Mental Health, which included the following definition of mental illness:

> Mental illness is a term that collectively refers to all diagnosable mental disorders. Mental disorders are health conditions that are characterized by alteration in thinking, mood or behavior (or some combination thereof) associated with distress and/or impaired functioning.

U.S. Dep't of Health and Human Services, Mental Health: A Report of the Surgeon General 5 (1999).[29] The Report goes on to name Alzheimer's Disease, depression, and attention-deficit/hyperactivity disorder as examples of conditions that fit under this expansive definition of mental illness. *See id.* at 5.[30]

Assuming for the moment that the Court would endorse the State's proffered 1959 definition of "mental illness," Maine's disenfranchisement of individuals under guardianship because they are idiotic, non compos, lunatic or distracted is not narrowly tailored to meet Maine's stated compelling interest. Under this definition, many more persons under guardianship would be subject to disenfranchisement, including those with mental retardation or late stage Alzheimer's Disease. However, even this broad definition could not logically be extended to include all persons under guardianship who may not have the capacity to understand the nature and effect of

---

29. *See also* Am. Heritage Dictionary at 1098 (4th ed.2000) (defining "mental illness" as "any of various conditions characterized by impairments of an individual's normal cognitive, emotional, or behavioral functioning, and caused by social, psychological, biochemical, genetic, or other factors such as infection or head trauma").

30. The Report also refers to and relies on the fourth edition of Diagnostic and Statistical Manual of Mental Disorders ("DSM–IV") for

an explanation of the variety of mental disorders currently recognized by mental health professionals. *See* U.S. Dep't of Health and Human Services, Mental Health: A Report of the Surgeon General 44 (1999). The DSM–IV list sixteen classes of mental disorder including: dementia and cognitive disorders, schizophrenia and other psychotic disorders, mood disorders, personality disorders, substance-related disorders; eating disorders and sleep disorders.

voting. For example, it would be illogical to say that a person who slips into a coma or persistent vegetative state as a result of a physical injury or ailment was "mentally ill" by 1959 standards.[31] Thus, State Defendants' historically-based definition of mental illness is not narrowly tailored to encompass all of the possible incapacitated persons who might lack the capacity to cast an individual ballot.

To the extent State Defendants would attempt to include all such incapacitated persons under the guise of "mental illness," the Court finds that such stretching of the term "mental illness" is an absurd extension of the plain language of the statute.[32] Thus, State Defendants' proffered definition of mental illness is either poorly tailored to meet their asserted interest or creates an absurd result that cannot be endorsed under Maine's principles of statutory construction. In some respects, State Defendants' interpretation appears to suffer from both of these infirmities simultaneously.

Even if the Court were to adopt a modern day, expansive definition of mental illness, such as the definition used by the Surgeon General, the State would be left with a voting restriction far broader than the status quo, which could potentially disenfranchise many persons under guardianship who presently have the right to vote. For example, a person placed under guardianship for an eating disorder could be disenfranchised because they are, in fact, considered to be suffering from a form of mental illness.

By including many more diagnoses within the category of "mentally illness," there is an even greater chance of "mentally ill" people, who maintain the capacity to understand the nature and effect of voting, being erroneously deprived of the right to vote, just as Jill Doe and June Doe have experienced. The Court realizes that the State now believes that by providing extra procedures it could adequately protect this larger group of "Jill Does" and "June Does" and actually end up disenfranchising fewer persons under guardianship. However, for the reasons explained in the Court's due process discussion, the Court cannot fairly and readily adopt such a dramatic change in probate court procedure.

In short, under any reasonable definition, "mental illness" cannot serve as a proxy for mental incapacity with regards to voting. See St. George v. Biddeford, 76 Me. 593, 596 (1885) (recognizing that a person "may be of unsound mind in one

---

31. Through the 1965 amendment, it is likely that the Maine Legislature sought to distinguish those under guardianship for physical illnesses as compared to mental illnesses. While the line between physical and mental ailments may have been clear to the Maine Legislature in 1965, the Court notes that in 2001 a person's capacity or incapacity to understand the nature and effect of the act of voting simply cannot be determined by classifying their illness as a mental illness or a physical illness. See U.S. Dep't of Health and Human Services, Mental Health: A Report of the Surgeon General 5 (1999) ("[E]veryday language tends to encourage a misperception that 'mental health' or 'mental illness' is unrelated to 'physical health' or 'physical illness.' In fact, the two are inseparable.")

32. Moreover, by casting a wider net with its definition of mental illness, State Defendants are forced to acknowledge that many "mentally ill" persons who are not under guardianship are allowed to vote in elections routinely although according to the State they are part of a group that may very well not understand the nature and effect of voting such that they can make an individual decision. That said, the Court believes that a voting restriction that uses guardianship proceedings to screen for lack of capacity to vote can satisfy the Equal Protection Clause. However, such a system is inevitably underinclusive to the extent that it cannot include persons who, despite suffering from mentally incapacitating conditions, are not subject to guardianship proceedings.

respect, and not in all respects"). After much consideration of a variety of definitions, the Court finds all definitions to be either fatally underinclusive or overinclusive. Thus, Maine's provision disenfranchising only those individuals under guardianship by reason of mental illness cannot be fairly and readily narrowly tailored by this Court to meet the State's asserted compelling interest in ensuring that those who vote understand the nature and effect of voting such that they can make an individual choice.

Because the Court cannot subject Maine's disenfranchising provision to any reasonable narrowing construction that would pass equal protection muster, it is forced to conclude that Maine's voting restriction has not only been applied in a manner that violates the Equal Protection Clause but is also facially invalid. On this basis, the Court concludes that Plaintiffs are entitled to judgment as a matter of law on Count I.

D. Title II of the Americans with Disabilities Act & Section 504 of the Rehabilitation Act (Counts II & III)

Finally, the Court turns to Plaintiffs' statutory claims asserted under Title II of the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act. Before examining whether Plaintiffs meet all the elements of these claims, the Court first addresses State Defendants' assertion of sovereign immunity with regard to Title II of the ADA.

1. Title II of the ADA after *Garrett*

State Defendants mount a two-pronged legal challenge regarding Plaintiffs' ability to press their ADA claims against the named State Defendants. First, they argue that Plaintiffs have failed to name the proper defendants. Second, State Defendants assert that the appropriate defendants to Plaintiffs' ADA claims are protected by sovereign immunity. At the outset, the Court notes that if it were to accept both of these arguments, Plaintiffs would have no way to enforce Title II of the ADA against the State.

■ State Defendants suggest that neither the Attorney General nor the Secretary of State, who are both named as Defendants in their official capacity, are "public entities" subject to Title II of the ADA. Contrary to Defendants' arguments, naming these agency heads as defendants is not a fatal flaw. In their respective official capacities, both the Maine Attorney General and the Maine Secretary of State are agents of the public entities they lead. In these roles, they may be properly named as defendants to a claim under Title II of the ADA.[33] *See, e.g., Olmstead v. L.C. by Zimring,* 527 U.S. 581, 594, 119 S.Ct. 2176, 144 L.Ed.2d 540 (1999) (naming the Commissioner of the Georgia Department of Human Resources, the Superintendent of Georgia Regional Hospital and the Executive Director of the Fulton County Regional Board as defendants for alleged violations of Title II of the ADA); *Theriault v. Flynn,* 162 F.3d 46, 46 (1st Cir.1998) (naming the Commissioner of the New Hampshire Department of Safety as defendant for alleged violation of Title II of the ADA); *see also Kentucky v. Graham,* 473 U.S. 159, 165–66, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) ("Official-capacity

---

**33.** Given the Court's finding that Plaintiffs may properly proceed against the named State Defendants in their respective official capacities, the Court need not reach the issue of whether Plaintiffs could alternatively proceed against State Defendants in their individ-

ual capacities under *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). *See Randolph v. Rodgers,* 253 F.3d 342, 348–49 (8th Cir.2001) (finding that plaintiff could assert a Title II claim against a state official pursuant to *Ex parte Young* ).

suits ... 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'") (quoting *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 690 n. 55, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)).

■ Realizing that Plaintiffs' ADA claims were likely to be construed as claims against the State, Defendants proceed to argue that Plaintiffs' ADA claims against State "public entities" are barred by the Eleventh Amendment according to the Supreme Court's recent decision in *Board of Trustees of the University of Alabama v. Garrett*, 531 U.S. 356, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001). The Court disagrees. *Garrett* explicitly does not address Title II of the ADA. *See id.* at 960 n. 1. Thus, the holding of *Garrett* simply allows states to invoke sovereign immunity when faced with claims for money damages under Title I of the ADA. *See id.* at 968 & n. 9. In this case, Plaintiffs state their claims under Title II and seek injunctive relief, not money damages. The Court declines to extend the *Garrett* decision to apply under these circumstances. *But see Walker v. Snyder*, 213 F.3d 344, 346–47 (7th Cir.2000) (finding that state was entitled to invoke sovereign immunity defense to claims under Title II of the ADA to the extent the claims "require[d] accommodation of disabilities (rather than simply requiring the state to disregard disabilities) and to the extent that [Title II] forbids a state to take account of disabilities that are rationally related to permissible objects of public action"), cert. denied, ___ U.S. ___, 121 S.Ct. 1188, 149 L.Ed.2d 104 (2001); *Alsbrook v. Maumelle*, 184 F.3d 999, 1007–10 (8th Cir.1999) (en banc) (finding state was entitled to

invoke sovereign immunity to claims under Title II of the ADA because Title II went beyond "enforc[ing] equal protection guarantees for the disabled as they have been defined by the Supreme Court").[34]

Thus, the Court concludes that State Defendants may not invoke sovereign immunity to shield them from Plaintiffs' claims under Title II of the ADA.

### 2. The Elements of Plaintiffs' Claims

Turning to the merits, the Court notes that even if it were to accept State Defendants' sovereign immunity argument, State Defendants would still be subject to substantially the same standard of conduct pursuant to Section 504 of the Rehabilitation Act. As the First Circuit has explained, Title II of the ADA "essentially extends the reach of § 504 [of the Rehabilitation Act] to state and local governmental entities that do not receive federal financial assistance." *Parker v. Universidad de Puerto Rico*, 225 F.3d 1, 4 n. 2 (1st Cir.2000). In this case, State Defendants have admitted that both the Department of the State Attorney General and the Department of the Secretary of State receive federal funds thereby subjecting them to Section 504 liability. (*See* State Defs. Answer to Second Am. Compl. ¶ 56A (Docket # 33).)

In *Parker*, the First Circuit explained that the decisional law on Title II of the ADA and Section 504 may be relied on "interchangeably." *Parker*, 225 F.3d at 4. With this similarity in mind, the Court finds it is appropriate to address the merits of Plaintiffs' Title II and Section 504

---

**34.** In light of the Court's conclusion with regard to Plaintiffs' equal protection and due process challenges, it is not clear that the reasoning utilized by the Seventh Circuit in *Walker* and the Eighth Circuit in *Alsbrook* is applicable to the ADA claim asserted by Plaintiffs. In this case, Plaintiffs are not seeking an accommodation and are seeking protection of fundamental rights secured through equal protection guarantees.

claims simultaneously.[35]

To succeed on both of these statutory claims Plaintiffs must establish: (1) that they are qualified individuals with disabilities; (2) that they were excluded from participation in a public entity's services, programs, or activities or otherwise discriminated against; and (3) that such exclusion or discrimination was by reason of their disability. *See id.* at 5.

 The Court finds that both Jill Doe and June Doe satisfy these elements.[36] Additionally, the Court finds that DRC has standing to press these claims on behalf of other individuals who have been disenfranchised because they were placed under guardianship by reason of mental illness. *See Access Living v. Chicago Transit Auth.*, No. 00–C–0770, 2001 WL 492473 at *2–*3 (N.D.Ill. May 9, 2001) (collecting cases finding that organizations have standing to pursue claims under Title II of the ADA).

State Defendants argue that Plaintiffs Jill Doe and June Doe cannot meet all of the elements because they actually have not been excluded from participation in voting. The Court finds Defendants' ripeness challenge meritless. The remaining Plaintiffs exemplify or represent persons under guardianship by reason of a mental illness who have not had their right to vote reserved. The plain language of Maine's Constitution excludes them from participating in elections as eligible voters. As the Court explained in its background section, a person under guardianship for mental illness who votes knowing that they are, in fact, prohibited from doing so subjects themselves to criminal prosecution. Plaintiffs need not subject themselves to criminal liability in order to present a ripe ADA claim.

Moreover, the Court is satisfied that Plaintiffs may satisfy the second element because they have been subjected to discrimination by public entities—namely, because they have been diagnosed with mental illnesses, they are subject to discriminatory treatment with respect to voting in public elections. *See* 42 U.S.C. § 12132; *see also* 28 C.F.R. § 35.130(b)(3)(i) ("A public entity may not ... utilize criteria or methods of administration that have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability.").

Although Plaintiffs have presented evidence that they are discriminated against with respect to voting "by reason of mental illness," State Defendants alternatively argue that they are entitled to judgment on these claims because of their newly proffered interpretation of the voting restriction, discussed at length above. According to State Defendants, this newly-crafted interpretation satisfies all the requirements of the ADA and simply makes capacity to understand the nature and effect of voting "an essential eligibility requirement for the

---

**35.** Plaintiffs initially moved for summary judgment on the ADA claim but did not include the Rehabilitation Act claim in their motion. State Defendants, on the other hand, included both the ADA claim and the Rehabilitation Act claim in their initial Motion for Summary Judgment (Docket # 41). Plaintiffs' oversight is not fatal. Because discovery has been completed and State Defendants have received adequate notice that summary judgment on this claim is possible on the same grounds as the ADA claim, the Court may grant summary judgment for Plaintiffs on the Rehabilitation Act claim sua sponte. *See Rogan v. Menino*, 175 F.3d 75, 79 (1st Cir.1999).

**36.** Because Jane Doe was reserved the right to vote prior to the November 2000 election, the Court finds any ADA claim or Section 504 claim by Jane Doe is MOOT. On this basis, the Court concludes that Defendant Bernier is entitled to judgment as a matter of law on both Counts II & III.

activity of voting." (State Defs. Mot. for Summ. J. at 19 (Docket # 41).) State Defendants note that Congress appears to have endorsed mental capacity as an essential eligibility requirement because the National Voter Registration Act does allow for state law to restrict persons from voting based on "mental incapacity." *See* 42 U.S.C. § 1973gg–6(a)(3)(B).

Regardless of what level of mental capacity may be considered an "essential eligibility criteria," the Court declines to review Plaintiffs' statutory claims in light of State Defendants' proffered "narrowing construction" of Maine's voting restriction. Unlike the constitutional claims discussed above, there is no such thing as a facial challenge to the State's compliance with a federal statute. A ripe claim for violation of a federal statute is based on either previous conduct or ongoing violations. Thus, in considering Plaintiffs' ADA and Rehabilitation Act claims, the Court may only consider the evidence regarding Maine's past application of its voting restriction along with any evidence relating to how the voting restriction continues to be applied today.

By all accounts, this restriction currently applies to mentally ill persons under guardianship—at least some of whom have the capacity to vote, thereby meeting the proposed essential eligibility criteria. *See Theriault*, 162 F.3d at 50 (explaining that the ADA prohibits "rejecting an applicant automatically as a result of his disease or its symptoms, without considering the individual's abilities"). Of course, if the State were to implement changes to Maine's voting restriction thereby limiting its application to only those who fail to meet the essential eligibility criteria, Plaintiffs' claims of ongoing ADA violations could become moot. However, State Defendants' mere suggestions for how it could bring its voting regulations into compliance with the ADA and Section 504 in the future are irrelevant.

In short, the Court is satisfied that the evidence proves State Defendants have violated the ADA as well as Section 504 of the Rehabilitation Act. None of State Defendants' legal arguments preclude this conclusion. On this basis, Plaintiffs are entitled to a judgment as a matter of law on both Counts II and III.

## IV. CONCLUSION

For the reasons stated herein, The Court finds that Article II, Section I of the Maine Constitution, along with its implementing statute found in 21–A M.R.S.A. § 115(1), violate both the Due Process Clause and the Equal Protection Clause of the Fourteenth Amendment. Thus, the State's disenfranchisement of those persons under guardianship by reason of mental illness is unconstitutional. Additionally, the Court finds that in implementing its voting restriction, State Defendants have violated Title II of the ADA and Section 504 of the Rehabilitation Act.

Therefore, the Court GRANTS Plaintiffs' Motion for Summary Judgment and DENIES State Defendants' Motion for Summary Judgment. To the extent Defendant Bernier joined in Defendants' Motion for Summary Judgment, the Court finds that the claims asserted against Defendant Bernier are MOOT.

SO ORDERED.